Juan ARRIETA–AGRESSOT, Regulo Rios,
Jose Antonio Barroso, Adalberto Agui-
lar–Epieyu, Adalberto Moncaris–Bermo-
dez, and Diego Caldas–Gonzalez, Plain-
tiffs, Appellants,

v.

UNITED STATES of America,
Defendant, Appellee.

UNITED STATES of America, Appellee,

v.

Adalberto AGUILAR–EPIEYU,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Alberto MONCARIS–BERMODEZ,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jose ANTONIO–BARROSO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Regulo RIOS, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Juan ARRIETA–AGRESSOT,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Diego CALDAS–GONZALEZ,
Defendant, Appellant.

Nos. 92–2103, 92–2136, 92–2207
to 92–2211 and 93–1946.

United States Court of Appeals,
First Circuit.

Heard Aug. 3, 1993.

Decided Sept. 8, 1993.

Rafael F. Castro–Lang, San Juan, PR, by Appointment of the Court, for appellants Adalberto Aguilar–Epieyu and Juan Arrieta–Agressot.

Frank D. Inserni, Hato Rey, PR, by Appointment of the Court, for appellants Jose Antonio Barroso, Regulo Rios and Diego Caldas–Gonzalez.

Joseph C. Laws, Jr., Hato Rey, PR, by Appointment of the Court, for appellant Adalberto Moncaris–Bermodez.

Ramon Garcia, San Juan, PR, by Appointment of the Court, on brief for appellant Regulo Rios.

Jeffrey M. Williams, by Appointment of the Court, Javier A. Morales Ramos and Indiano, Williams & Weinstein–Bacal, San Juan, PR, on brief for appellant Juan Arrieta–Agressot.

Yolanda A. Collazo Rodriguez, Los Angeles, CA, by Appointment of the Court, on brief for appellant Diego Caldas–Gonzalez.

Carlos A. Perez–Irizarry, Assistant United States Attorney, with whom Charles E. Fitzwilliam, United States Attorney, and Jose A. Quiles Espinosa, Senior Litigation Counsel, Hato Rey, PR, were on brief for the United States.

Before SELYA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

The six appellants in this case were convicted in the district court in Puerto Rico of possession of marijuana with intent to distribute while on board a vessel subject to the jurisdiction of the United States. 46 U.S.C.App. § 1903(a). The prosecutor made inflammatory remarks to the jury, and we cannot say that the evidence made conviction inevitable. We therefore vacate the convictions and remand for further proceedings.[1]

Appellants were crew members aboard a fishing vessel named the *Jurango Kiss,* which was intercepted by the U.S. Navy and accompanying U.S. Coast Guard personnel about 100 miles off the coast of Colombia and found to be carrying approximately 11,885 pounds of marijuana. The government had no direct evidence that the crew members knowingly possessed the marijuana with intent to distribute, and the success of its case lay in persuading the jury beyond a reasonable doubt that the crew members must have had the necessary knowledge and intent. This task was complicated by the testimony of Pedro Silvio Croes–Vincente, the captain of the vessel, who was tried and convicted along with the crew members but has not appealed. Croes–Vincente testified that the crew members came aboard the *Jurango Kiss* just before the voyage and did not know of the illicit cargo.

---

1. The appeals from the convictions are Nos. 92–2207, 92–2208, 92–2209, 92–2210, 92–2211, and 93–1946. The remaining appeals, relating to the petitions under 28 U.S.C. § 2255 (Nos. 92–2103 and 92–2136), are dismissed as moot.

Throughout his closing argument the prosecutor urged the jury to view this case as a battle in the war against drugs, and the defendants as enemy soldiers. During his initial closing remarks the prosecutor told the jury:

> When the captain ... and the rest of the defendants departed Colombia they knew what was inside the boat. They knew that the boat was full with bales of marijuana, and they had no concern for the youth. They had no concern for the people that would have used the marijuana. They had no concern for the people that would have been addicted by the use of marijuana.

In his rebuttal argument the prosecutor returned to this theme:

> Nobody has the right to poison the people and poison our children. I can tell you that I don't have an issue with that; but I know the pain, the suffering that is brought into many families by the use of drugs, by the use of marijuana, by the addiction to marijuana.
>
> And you know that. You know that that is a real problem. And we are here today because we want to say no to drugs. We want to say no to what is corrupting and disrupting the society, because marijuana not only disrupts and corrupts our society but it also corrupts and disrupts any society in the world.

Later in his rebuttal, the government's lawyer continued:

> But thank God at that time we had the Coast Guard on board the [U.S.S.] SIMMS.... Because not only they are [sic] protecting us; they are protecting the people, they are protecting the youth, they are protecting other societies.
>
> That is why, ladies and gentlemen of the jury, they were in the drug interdiction. To save you all from the evil of drugs. Because the defendants are not soldiers in

the army of good. They are soldiers in the army of evil, in the army which only purpose [sic] is to poison, to disrupt, to corrupt.

We think it is crystal clear that inflammatory language of this ilk falls well outside the bounds of permissible argument. In *United States v. Machor*, 879 F.2d 945, 955 (1st Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043, 493 U.S. 1094, 110 S.Ct. 1167, 107 L.Ed.2d 1070 (1990), a prosecuting attorney in Puerto Rico told the jury during his closing statement that "[cocaine] is poisoning our community and our kids die because of this." In *United States v. Doe*, 860 F.2d 488, 494 (1st Cir.1988), *cert. denied*, 490 U.S. 1049, 109 S.Ct. 1961, 104 L.Ed.2d 430 (1989), a prosecutor from that same district argued to the jury that marijuana is "poison that is destroying our children in our schools [and] is bringing an end [to] our youth...." In both cases we sharply rebuked the prosecutor for making these comments, because they "serve no purpose other than 'to inflame the passions and prejudices of the jury, and to interject issues broader than the guilt or innocence of the accused.'" *Machor*, 879 F.2d at 956 (quoting *Doe*, 860 F.2d at 494).[2]

Once again, we affirm our view that such arguments are plainly improper. It is hard enough for a jury to remain dispassionate and objective amidst the tensions and turmoil of a criminal trial, and this is not the occasion for superheated rhetoric from the government urging jurors to enlist in the war on drugs. The Seventh Circuit appears to have approved references to "society's drug problem" in a prosecutor's argument, although milder in tone and briefer than the remarks here. *See United States v. Ferguson*, 935 F.2d 1518, 1530–31 (7th Cir.1991). Still, it is remarkable, in light of *Machor, Doe* and a slew of other recent cases in this circuit,[3]

---

**2.** We went on to hold in *Machor* and *Doe* that the comments, though "totally unjustified," *Doe*, 860 F.2d at 495, did not warrant reversal because the evidence against the defendants was "very strong," *Machor*, 895 F.2d at 956, and "overwhelming," *Doe*, 860 F.2d at 495, and because in *Machor* the remarks were made in rebuttal to similar comments by defense counsel.

**3.** *E.g., United States v. Moreno*, 991 F.2d 943, 947 (1st Cir.1993) (reference in closing argument to "protecting the community that has been plagued by violence, senseless violence, shootings and killings" was "patently improper"); *United States v. Rodriguez–Cardona*, 924 F.2d 1148, 1153–54 (1st Cir.) (improper reference to "deadly trade of narcotics trafficking" and to

that the government defends as proper its closing argument in this case.

However, defense counsel in this case failed to object to any of the prosecutor's remarks. Courts of appeals are reluctant to entertain claims of error absent timely objections at trial. Most trial judges are leary of *sua sponte* interventions, so the failure to object usually precludes a curative instruction, a warning about further remarks, or some form of amelioration. And, allowing such claims to be raised for the first time on appeal may encourage strategic decisions by trial counsel to remain mute in the face of error, reserving an issue for appeal in the event of conviction.

 For these reasons, we will reverse a conviction where no objection was made at trial only in the rare case in which the mistake rises to the level of "plain error." *See* Fed.R.Crim.P. 52(b); *Machor,* 879 F.2d at 955. Most errors are plain after the event, and the phrase is something of a misnomer: "[t]he plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). Reversal is appropriate only if the illegitimate argument "so poisoned the well that the trial's outcome was likely affected." *United States v. Mejia–Lozano,* 829 F.2d 268, 274 (1st Cir.1987).

 In making this *post hoc* judgment, a crucial factor is the weight of the evidence of the defendants' guilt or innocence. *See United States v. Santana–Camacho,* 833 F.2d 371, 373–74 (1st Cir.1987). We do not in such a case take the evidence in the light most favorable to the government or assume that credibility issues were resolved in its favor. The jury may well have decided the issues in favor of the government, but that jury decision may itself be tainted by the improper remarks. Thus we will look at the

evidence as a whole and, despite the lack of objection, we will reverse if the error is manifest and if there is a substantial chance that absent the error the jury would have acquitted.

In this case, a reasonable jury could on the evidence offered have found the crew guilty beyond a reasonable doubt, but there was also evidence that made acquittal a realistic possibility. At trial, the government proved that on December 7, 1987, the U.S.S. *Simms* was conducting drug interdiction patrols in the Caribbean Sea when it detected the *Jurango Kiss* about 12 miles away, approximately 100 miles north of Colombia. A helicopter reported that the vessel was fashioned to look like a fishing ship but had no outriggers, nets or fishing poles; that it did not display a registration number; and that it was headed northbound toward the passage between the Dominican Republic and Puerto Rico.

As the helicopter pilot approached the *Jurango Kiss* for the second time, he saw numerous burlap- or plastic-wrapped bales floating in the water and, when he got closer to the ship, saw a man on the deck throwing bales overboard. The pilot also observed that the ship had completely changed course and was now heading south. After a short time the *Simms* came alongside the *Jurango Kiss* and, after unsuccessfully attempting radio contact, a small crew from the *Simms* boarded the suspect vessel and ordered the captain and his seven crewmen to congregate on the upper deck.[4]

The captain of the *Jurango Kiss* claimed not to know the vessel's country of registry and was unable to produce any documentation. A protective sweep of the vessel revealed 146 bales containing a green leafy substance, most of which were stacked in plain view below deck in the ship's compartment and a few of which were on the deck. Another 17 identical bales were found floating in the sea and brought aboard the *Simms.* A field test of samples of the bales' contents was positive for marijuana. Mem-

---

appellant's "evilness"), *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991).

4. One of the crew members pleaded guilty, leaving only the captain and the six appellants to stand trial.

bers of the boarding party described the *Jurango Kiss* as dilapidated and practically unseaworthy, carrying little by way of food or clothing, having sleeping quarters for only two persons and smelling of marijuana.

After the government rested, the defendants called Croes–Vincente, the captain of the *Jurango Kiss.* The captain, virtually conceding his own knowledge of the drug smuggling operation, told the jury that his crew was not involved. He testified that six of his crewmen were brought to the vessel shortly before it departed by "the people who were running the show." The seventh was recruited from a fishing vessel that happened to be in the vicinity of the *Jurango Kiss* on the morning of its departure. The crew did not participate in loading the cargo, and did not see the cargo or even go below deck until after the vessel departed. Croes–Vincente testified that the crewmen were never told the nature of the voyage, and explained that they were intentionally kept in the dark "so they cannot talk if they get busted."

Despite this testimony, the government's evidence would have been sufficient to support a verdict of guilty against the crew members in a trial free from error. A jury might reasonably choose to disbelieve the white-wash testimony of Croes–Vincente, and infer from the circumstances that the crew members must have known of and participated in the smuggling. But what a reasonable jury might have done in a trial free from error is not the issue. The question, at least on direct appeal, is whether the prosecutor's repeated appeals to impermissible considerations might well have altered the verdict, thereby affecting appellants' substantial rights. In this case, given the potency of the misstatements and the presence of direct exculpatory testimony, we think that the answer is yes.

In arguing to the contrary, the government says that given the conspicuous stacks of bales and the smell of marijuana, anyone aboard must have known that drug smuggling was the task at hand. But this evidence was tempered by the captain's testimony that the crewmen were hired and brought aboard "the moment that the boat was ready to leave" and had no opportunity to view the cargo or inspect the ship prior to setting sail. The government also stresses the jettisoning of the cargo, but the captain testified that he ordered the men to throw the bales overboard and they were merely following his command. In weighing the captain's testimony, the jury might also have considered that the testimony was against the captain's own interest.[5]

On occasion, we have declined to find plain error where the prosecutor's remarks were provoked by inflammatory arguments by defendants' own counsel. *E.g., Machor,* 879 F.2d at 956. By and large, defense counsels' arguments in this case were brief and confined to legitimate issues in the case. Defendants' counsel did intimate during trial that the Navy and Coast Guard intimidated the defendants with a show of weaponry and military force. While that theme may have justified the prosecutor's defense of the government officers, it did not warrant his repeated references to the war on drugs, corruption of society and "protecting the youth." *See Santana–Camacho,* 833 F.2d at 375 (finding plain error where prosecutor's remark "was not made in response to any improper statement made by the defense counsel").

The district court here read the standard instruction informing the jury that arguments of counsel are not evidence, and we have sometimes found that instruction enough to counteract any lingering prejudice from an improper summation. *See, e.g., Mejia–Lozano,* 829 F.2d at 274. Here, however, the danger was not so much that the jury would consider the prosecutor's statements to be "evidence." Rather, the threat was that the prosecutor's remarks would excite the jury, invite a partisan response, and distract its attention from the *only* issue properly presented by this case: whether the

---

5. By testifying as he did the captain certainly forfeited the benefit of any doubt the jury might have had regarding his own participation. The captain's sole defense at trial was that the *Juran-* go Kiss was not a "vessel subject to the jurisdiction of the United States," which is an element of the crime charged. 46 U.S.C.App. § 1903(a).

evidence established the crew members' guilt beyond a reasonable doubt.

Although the extent of the prejudice is the paramount issue, we think it necessary to say that the nature of the misconduct also plays a part in our judgment. Almost any argument made in summation can be described as deliberate; but the several paragraphs of 150-proof rhetoric in this case overstep the bounds by a wide margin. Here, the prosecutor was inexperienced at the time of trial, as he candidly told us at oral argument, and we do not dwell further on personal fault. In fact, the unhappy outcome in this case—including the expense of retrial, the waste of the trial court's time, and the burden on the appellants—is less a reproach to the individual assistant U.S. attorney than to those who superintend young prosecutors in the district in question.

In sum, on review of the entire record, we are convinced that "the prosecutor's misstatement[s] [were] no mere incidental embellishment to an otherwise powerful case." *Santana–Camacho*, 833 F.2d at 374. Here, the case was adequate but not overwhelming, and the jury may have been swayed by the prosecutor's impermissible rhetoric. There is ample basis for the prosecutor's view that the drug problem facing this country is "corrupting and disrupting the society." But federal prosecuting attorneys ought to be mindful of the harm done when those in power ignore the rules governing their own conduct while demanding strict compliance from others.

The convictions are *vacated* and the cases *remanded* for further proceedings.