UNITED STATES of America, Appellee,

v.

Patience O. UDECHUKWU,
Defendant, Appellant.

UNITED STATES of America, Appellant,

v.

Patience O. UDECHUKWU,
Defendant, Appellee.

Nos. 93–1020, 93–1081.

United States Court of Appeals,
First Circuit.

Heard Nov. 2, 1993.

Decided Dec. 22, 1993.

**1102**

Rachel Brill, for Patience Udechukwu.

Joseph Frattallone Marti, Asst. U.S. Atty., with whom Guillermo Gil, U.S. Atty., and Jose A. Quiles Espinosa, Sr. Litigation Counsel, were on brief, for U.S.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

COFFIN, Senior Circuit Judge.

These are cross-appeals arising from the conviction of defendant Patience O. Udechukwu, a Nigerian citizen and U.S. resident, for serving as a heroin courier from Aruba to the United States, in violation of 21 U.S.C. §§ 841(a)(1) (possession of controlled substances with intent to distribute), 952(a) (importing such substances into U.S. customs territory), and 955 (possession on an aircraft of controlled substances not listed in the cargo manifest).

Defendant's principal claims on appeal are that the government improperly failed to disclose the results of its investigation into information she provided about her Aruba source of supply, and that the prosecutor's closing argument deliberately suggested the contrary of the facts known to the government. The government appeals the sentence imposed, claiming that the court lacked authority to depart downward from the applicable minimum mandatory sentence of 60 months to 41 months in the absence of a prosecution motion requesting such a departure.

Since we conclude that the conviction must be set aside and a new trial granted, we do not reach the government's appeal.

### Defendant's Arrest

On June 26, 1992, defendant was the last to leave flight 627 after its arrival in San Juan, Puerto Rico, from Aruba. A customs inspector, having asked for and received defendant's Customs Declaration Card, proceeded with an inspection of defendant's luggage and person. Although nothing unusual was revealed by the inspection, the inspector became increasingly suspicious because of defendant's nervous demeanor, her statement that she had just returned from visiting her boyfriend (although her passport re-

vealed her married status), her subsequent statement that she did not know the whereabouts of her husband, and her professed ignorance of her ticket's scheduled layover in Chicago.

A computer check revealed no "intelligence lookouts" or criminal involvements recorded in defendant's name and a "pat-down" authorized by the inspector's supervisor also had negative results. Then, on suspicion that defendant was an "internal swallower," a customs special agent, Ana Rolon, obtained defendant's consent to an x-ray. She was then taken to a medical center. As she disrobed, she was observed putting in her clothing an object which was soon seized by agent Rolon, observed to be a round pellet wrapped in electrical tape inside a condom, then field tested and shown to be heroin. Meanwhile, x-rays revealed three foreign bodies in defendant's rectum. Defendant was arrested as soon as the field-test results were known and later expelled the three foreign objects, which proved to be similar pellets of heroin powder. A fifth pellet was found in the automobile that transported defendant to the medical center. The total quantity of heroin recovered was 395 grams.

### Defendant's Duress Defense

As the above scenario suggests, the objective facts concerning defendant's possession and importation were clearly established. Defendant's defense was that she had been coerced into her role as a courier by the man she had visited in Aruba.

Immediately after her arrest, late on a Friday afternoon, defendant was brought before a U.S. magistrate judge. When she was told there would be no detention hearing until Monday, she said that Monday would be too late and that she needed to talk with someone right away. The magistrate judge then undertook to obtain counsel for appellant, and succeeded in reaching Assistant Federal Public Defender Brill, who has represented appellant ever since. After talking with appellant, Brill told the magistrate judge that the source of the drugs was in Aruba, that their destination was Chicago, and that appellant wanted to cooperate with the government and make a controlled delivery in Chicago on the following day, June 27, since the prospective recipient might still be expecting a phone call from Udechukwu.

In following up on her client's offer, attorney Brill was referred by a customs supervisor to an assistant United States attorney. The government attorney proved to be unavailable over the weekend, however, and no controlled delivery took place. On Monday, June 29, appellant was debriefed by agents Rolon and Baez in counsel Brill's presence. Contemporaneous notes taken by agent Baez were apparently the basis for a "Report of Investigation" issued some two months later, on August 25, ten days before the commencement of trial.

According to the report, appellant told the agents of a long acquaintance with a fellow Nigerian, whose name was then recorded as Michael Mouhma, who had lived with appellant and her family in 1982 for six months. Michael had returned for a visit in 1988 but, for some untold reason, had his visa canceled in 1992. Michael recently had called appellant from Aruba, asking her to come and threatening that "it would only take one call to hurt her and her kids if she did not come...." Defendant bought her air ticket, using her Visa card. In Aruba Michael instructed her to take the contraband to an individual in Chicago who could be reached on a certain beeper number; he would buy her a return trip ticket and give her the money for Michael. Michael forced her to carry the contraband in her vagina and rectum, telling her that her husband had been arrested in Mexico in 1989 when carrying drugs from Aruba because he did not follow instructions to carry the contraband internally. Defendant had given the phone number of Michael's Aruba hotel room to agent Rolon at the time of her arrest.

At trial, defendant expanded on this summary. She told of her husband's effort in 1989 to assist bringing Nigerians into the United States, which she believed had resulted in his incarceration in Mexico since that time. In his recent call from Aruba, Michael proposed that she join him in a visit to her husband. She was afraid to travel alone to Mexico and, after talking with her children, bought a ticket for $1,400. When she arrived

in Aruba, Michael met her, took her to a hotel, took her passport, "green card," and room key, and later told her of a change in plans. Instead of going immediately to Mexico, she was to carry some packages for him to Chicago. To ensure her compliance, he threatened that he knew Mafia people and that it would take only a phone call to "get action." He knew where defendant lived, where she worked, where her children went to school. She felt she could not escape and the hotel phone did not work. Michael finally assisted in inserting some of the pellets. The day after she was apprehended in San Juan, she called a friend in San Diego, told her about Michael's threats, and arranged to have her seven children cared for by the local Nigerian community.

*What the Government Knew*

Defendant's duress defense was closely tied to her counsel's efforts to obtain evidence from the government that would corroborate her account of what had happened. In particular, defendant sought corroboration of her identification of Michael as the source of the drugs she had carried. Although she did not know of the extent of Michael's involvement in drug trafficking until after her trial, she argues that the government knew, before trial, that Michael Mouma (his correct surname) had been a drug trafficker and government target for several years. Since the issue of government knowledge is critical to this appeal, we summarize the record.

1. *Before trial.* From the beginning, defense counsel stressed defendant's willingness to cooperate. On the day of her arrest, June 26, counsel had conveyed defendant's desire to participate in a controlled delivery in Chicago. At defendant's debriefing on June 29, she gave to the arresting officials the name of her source, which was transcribed as Michael Mouhma. The agents already had seized a piece of paper with Michael's Aruba hotel room telephone number. In a letter dated July 2, defense counsel had written the prosecutor of her conversations with defendant, closing with a request to be kept up to date "as to any further developments."

Trial was scheduled for September 4. On August 4, defense counsel moved for the production of any exculpatory and Jencks Act material, see 18 U.S.C. § 3500; on August 28, the court granted the requests.

2. *At trial.* On September 4, the first day of trial, the prosecution delivered to defendant a "Report of Investigation" that had been prepared on August 25. This report referred to "an individual later identified as Michael MOUHMA (MICHAEL)," related defendant's account of her being threatened, but contained no further information about Michael.

Upon being pressed at trial for what, if anything, the government had learned from information given it by defendant, customs agent Rolon testified:

> The name—the name that she gave me was only Michael. She just gave me and she wrote in the piece of paper what she thought [ ] was his last name. Okay? With what she gave me I find nothing, but based on my experience I started digging into and looking for it with what I have, and I started like matching some facts....

> \*     \*     \*     \*     \*     \*

> I have—we started with the information that I received based on all the documents that we find, the numbers, this and that on the—on a person that has been detained. I keep a copy and start doing some investigation as to who it belongs, et cetera, the subscribe—the telephone subscriber.... It takes time because I depend on different agencies, and some information is—it's protected by the ... privacy act.

As a result of defendant's information, agent Rolon said, "the other name help[ed] in a way to identify that there is another association or organization which involves ... the source ... in Aruba."

3. *Post trial.* After trial, on September 18, defendant moved for the production of any rough notes made by agent Rolon relating to the "ongoing investigation" she had alluded to in testimony. The government's written reply stated that only agent Baez had made notes at the debriefing, which were then submitted, revealing nothing differing in

substance from the August 25 report. The government added:

Let the record be clear in that defendant's limited cooperation has NOT resulted in any new investigation. What little she was willing to offer was relayed by S/A Ana Rolon to an off-district agency which AL-READY had an ongoing investigation into the relevant subject matter at the time defendant was arrested in Puerto Rico.

4. *Oral argument on appeal.* At oral argument before us, the prosecutor stressed that the cooperation of defendant was limited, that the last name of her source had been misspelled, but that at some point he had been tracked down. The prosecutor acknowledged that not only had Michael been identified, but he had been a target since 1988. Although the prosecutor further argued that this fact was made known to the defense before trial, he referred to a page in the record that contains no information about Michael's known relationship to the drug trade.

### The Prosecution's Closing Argument

Against this background of non-disclosure of not only Michael Mouma's existence but of his known prominence for some four years as a targeted drug trafficker, we examine the prosecution's closing argument. In so doing, we stress that we specifically put to one side defendant's argument that the government had the duty to follow up with a prompt and energetic investigation on the basis of the information given by her. How the government chooses to invest its resources is a matter solely of its own concern.

But if the government does find that information given by a defendant proves to be accurate, this is of significance to the defense and its interest in strengthening the defendant's credibility. In this case the fact that there was indeed a Michael in Aruba with a surname strikingly similar to that reported by defendant would have given some support to defendant's story. And the fact that this person had long been known as a drug trafficker would have enhanced considerably the believability of defendant's story of being threatened by someone who had the capacity to make good on his threats. Whether the government's failure to disclose this credibility-strengthening information could be said to

be reversible error, we need not decide. We have no doubt, however, that the prosecutor's persistent theme in closing argument suggesting the nonexistence of this information—and even the opposite of what the government knew—did fatally taint the trial.

The prosecutor's closing argument began by raising doubts as to defendant's story, referring to Michael in skeptical terms. The prosecutor noted defendant's plan to go to Aruba, not Mexico, "to meet with this person she calls Michael." He subsequently made reference to "this man, whomever he—he is which she calls Michael, [who] was indeed her boyfriend." And he again implicitly questioned Michael's existence when commenting upon her claim that she did not learn of any threat until after she reached Aruba and "was advised by this alleged Michael that there was a threat against her children." Innuendo then escalated to contradiction. After challenging defendant's credibility by pointing out how long it had taken for her to tell anyone about Michael's threats against her children, the prosecutor noted, "One more thing which you need to keep in mind as you listen to defendant's argument and that is whether this Michael in Aruba is really a drug—whether he really exists, whether there really is a drug source besides the defendant."

At this point defense counsel objected. She argued that, while foreclosed for confidentiality reasons from asking questions about the government's investigation into the information provided by defendant, "I do not believe that the government should now be able to argue that that information has led to nowhere or that it is meaningless and that something else was the truth." In response, the prosecutor explained that he was pointing to the unlikelihood that "this guy" would send defendant to Chicago with no round trip ticket or information about how much money was supposed to be returned to him. The court allowed the government to argue that it would strain the imagination to accept that "the guy" in Aruba entrusted defendant with a quarter million dollars worth of heroin with no instructions concerning how much money she was to bring back. Not being content with this thrust, the prosecution added a final sally in rebuttal by asserting that defendant's children could not have been in trouble or

she would have reacted sooner: "[s]he didn't want to stop Michael or whomever his—or whatever his name is. She wanted to stop us from catching her."

Most of this was legitimate argument. The inferences and the direct challenge to the existence of a source named Michael, however, when the prosecution had unearthed evidence that he existed and was a prominent dealer in narcotics, is indefensible. Here we find a kind of double-acting prosecutorial error: a failure to communicate salient information, which, under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), should be disclosed to the defense, and a deliberate insinuation that the truth is to the contrary. As we pointed out in *United States v. Smith,* 982 F.2d 681, 683 (1st Cir.1993), "it [is] not improper to urge the jury to evaluate the plausibility of the justification defense in light of the other evidence (and the lack thereof)," but "it is plainly improper for a prosecutor to imply reliance on knowledge or evidence not available to the jury." It is all the more improper to imply reliance on a fact that the prosecutor knows to be untrue, or to question the existence of someone who is known by the prosecution to exist.

In *United States v. Ingraldi,* 793 F.2d 408, 416 (1st Cir.1986), we enunciated the following five-part test:

> In deciding whether a new trial is required—either because prosecutorial misconduct likely affected the trial's outcome or to deter such misconduct in the future— we consider the severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely curative effect of the judge's admonitions and the strength of the evidence against the defendant.

The record here presents a strong case against the defendant—overwhelming with respect to her transporting the drugs and substantial in suggesting knowledge that the objects carried were contraband. Insofar as the evidence of voluntariness or coercion is concerned, everything depended on defendant's credibility. But that credibility was weakened immeasurably by the absence of evidence that Michael was a targeted drug trafficker and, indeed, by insinuations that no such source even existed. Conversely, defendant's story would have been dramatically corroborated by the information available to the government.

All of the other tests tilt strongly in favor of the defense. The non-disclosure was both severe and deliberate. It is difficult to accept that the results of such a methodical and painstaking investigation as that described by agent Rolon could have been lost in the shuffle of case preparation. Even if the failure to inform defendant were not intentional, the carelessness was just as harmful. The context was such that the most critical factor in defendant's tale of coercion—the coercer— was the casualty of the government's nondisclosure and ill-taken skepticism. And there was no question about any curative instruction, because the court itself was in ignorance of what the government knew but did not reveal.

It is regrettable that a case in many respects well and fairly tried and carefully monitored by the court must be undone, the conviction reversed, and a new trial ordered. But both law and fairness so dictate.

*The judgment is reversed and the cause remanded for a new trial.*