USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-1893 UNITED STATES, Appellee, v. TRENT MANNING, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, Senior U.S. District Judge] __________________________ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Robert B. Mann with whom Mann & Mitchell was on brief for ________________ ________________ appellant. Sean Connelly, Attorney, U.S. Department of Justice, with whom _____________ Edwin J. Gale, United States Attorney, District of Rhode Island, was _____________ on brief for appellee. ____________________ May 6, 1994 ____________________ STAHL, Circuit Judge. In this appeal, defendant- STAHL, Circuit Judge. _____________ appellant Trent Manning challenges, on several grounds, his convictions for possession with intent to distribute cocaine, use of a firearm during and in relation to a drug trafficking crime, and possession of a firearm by a convicted felon. Manning's principal appellate claim is that improper comments made by the prosecutor during closing arguments undermined the fairness of his trial. After carefully reviewing the record, we conclude that the prosecutor's comments did so infect the proceedings below that Manning is entitled to a new trial. Accordingly, confining our discussion and analysis to the prosecutorial misconduct issue, we vacate the convictions. I. I. __ BACKGROUND BACKGROUND __________ A. Relevant Factual Background A. Relevant Factual Background _______________________________ It is undisputed that late in the afternoon on October 7, 1991, several members of the Providence Police Department executed a search warrant at Manning's mother's house, located at 151 Doyle Avenue in Providence, Rhode Island. In the course of their search, the police officers seized, inter alia, a brown briefcase which contained the _____ ____ material that formed the basis of the charges in the indictment: two bags of cocaine weighing 124.64 grams, -2- 2 various drug paraphernalia, a loaded .9 millimeter handgun, and six copper pipe bombs. It also is undisputed that just prior to the raid, two men drove up to Manning's mother's house in Manning's red Jeep Cherokee. The man in the passenger seat was one Sean Duncan, who was detained by the police but never charged in connection with this case. The vehicle's driver, however, was not apprehended at the scene. The identity of the driver was (and is) perhaps the most hotly contested issue in this case, as it was (and is) the government's theory that the driver brought the brown briefcase into the house. The government argued successfully that the driver was Manning; Manning and Duncan testified that the driver was one Troy McKenzie. The primary government witness on the issue of the driver's identity was Detective Joseph Lennon, a member of the search team that day. Lennon testified that, after having been given the order to execute the search warrant, he approached the rear of 151 Doyle Avenue, where he saw Manning, whom he knew and with whom he had conversed on other occasions, standing outside the Cherokee and in front of the house's garage. Lennon testified that Manning was holding the brown briefcase. Lennon also testified to seeing Duncan seated in the passenger seat of the Cherokee. Lennon further testified that, upon seeing Manning, he identified himself as a police officer and, with gun -3- 3 drawn, ordered Manning to stop. According to Lennon's testimony, Manning ignored this directive, walked slowly into the garage, and closed and locked the door behind him. Lennon testified that his pursuit of Manning into the building was delayed by the presence of Manning's rottweiler, which was running around loose in the driveway area behind the house. After eventually gaining entrance to the garage (about three to five minutes later), Lennon found and seized the brown briefcase. He did not, however, find Manning in the house. Detective David Lussier also testified concerning the identity of the driver of the Cherokee just prior to the raid. Lussier, who also had known Manning for some time, testified that he observed Manning, along with a companion, drive by his surveillance position (located about 50 yards from the house in a parking lot which provided a direct view into the rear yard of 151 Doyle Avenue) just three or four minutes before the raid. Indeed, Lussier testified that he ordered that the warrant be executed at that time precisely because he feared that eye contact between himself and Manning had caused his surveillance to be compromised. After ordering the raid, Lussier testified that he drove to the front of the house, entered it through the front door, and proceeded to the basement, where he found a broken window through which Manning apparently had escaped. -4- 4 In contrast to the detectives' testimony, both Sean Duncan and Manning testified that the driver of the car at the time of the raid was (as noted above) Troy McKenzie. The substance of their testimony was that Duncan and Manning had been riding around together throughout the day, that they had picked up McKenzie at some point in the afternoon, and that they thereafter drove to the residence of Manning's girlfriend. At this point, Manning gave McKenzie and Duncan $40 and asked them to take his rottweiler, which was being kept at his mother's house, to the veterinarian for a rabies shot. McKenzie and Duncan then drove the Cherokee over to Manning's mother's house to pick up the dog. Duncan testified that McKenzie entered the house to fetch the dog while he waited in the car. Shortly thereafter, the raid occurred. Duncan also testified that he had "no idea" was happened to Troy McKenzie after he entered the house. One week after the execution of the search warrant, Manning voluntarily turned himself in to the police. He subsequently was charged with and convicted of the crimes noted above, all of which necessitated a finding that Manning was the person in possession of the brown briefcase who disappeared into 151 Doyle Avenue at the time of the raid. B. The Prosecutor's Comments B. The Prosecutor's Comments _____________________________ Manning complains of four different comments made by the prosecutor during the course of his closing argument. -5- 5 First, Manning contends that the prosecutor improperly vouched for the credibility of certain prosecution witnesses during the following colloquy: [PROSECUTOR]: If Lussier is going to come in and lie to you he could have done that very, very easily. There's a million little ways they could have given it to the Defendant. But they cannot. The prosecution witnesses cannot engage in that kind of conduct. They're bound by the truth. [DEFENSE COUNSEL]: I object to that, your Honor. THE COURT: Overruled. [PROSECUTOR]: They're bound by their oath and limits of honesty. The last thing you might ask yourselves --- [DEFENSE COUNSEL]: I object to that, again I have a motion. THE COURT: Overruled, motion denied. (Hereinafter "First Passage"). The government concedes that this passage contains improper witness-vouching by the prosecution. Next, Manning argues that the prosecutor engaged in additional improper witness-vouching and inappropriately implied that he had additional incriminating evidence when, in responding to a defense argument concerning the lack of probative fingerprint evidence on the items in the brown briefcase, he stated: [PROSECUTOR]: [W]hen we get to this gun and these bombs and this dope we've got an eyewitness who knows the Defendant and -6- 6 saw it all in his hands. So it doesn't matter whether there's a print on it or not. But they looked anyways and what did that BCI officer tell you? He told you that there were some partial prints on those items but nothing that was good enough to use for identification purposes. Nothing that has sufficient points of comparison on it for him to be positive and we have to be fair, we have to be positive. Prosecution --- [DEFENSE COUNSEL]: I object to that, Judge. THE COURT: Overruled. [PROSECUTION]: Prosecution must always be fair. . . . (Hereinafter "Second Passage"). The government acknowledges that this prosecutorial argument also contained improper witness-vouching, but denies that it implied the existence of additional incriminating evidence. Rather, the government contends that it was an effort to suggest "that prosecution witnesses had not created false evidence[.]" Third, Manning asserts that the prosecutor impermissibly appealed to the jury's emotions when, near the conclusion of the prosecutor's initial closing argument, the following exchange took place: [PROSECUTOR]: Twelve responsible people will deliberate on this case. Take responsibility for yourselves. Take responsibility for your community. [DEFENSE COUNSEL]: I object to that. THE COURT: The jury's responsibility is to follow the Court's instructions and find the facts. -7- 7 (Hereinafter "Third Passage"). The government denies that thisargumentconstituted animproperappealtothe jury'semotions. Finally, Manning charges that the prosecutor again impermissibly appealed to the jury's emotions at the conclusion of his rebuttal argument: [PROSECUTOR]: Convict the Defendant fairly because the facts and the law compel conviction. Convict the Defendant because justice compels conviction. [DEFENSE COUNSEL]: I object to that, too. . . . THE COURT: I direct the jury to ignore the last statement of the United States Attorney. Your responsibility, as I told you at the beginning, is to determine whether or not, in light of the law that is given to you by the Court, the government has met its burden of proving the Defendant guilty beyond a reasonable doubt. . . . (Hereinafter "Fourth Passage"). Although it is not entirely clear, the government appears to concede that this argument was improper. See Government's Brief at 41 (acknowledging ___ that this argument "is somewhat similar to exhortations that have been deemed impermissible"). II. II. ___ DISCUSSION DISCUSSION __________ Manning's prosecutorial misconduct argument, as developed in his brief and at oral argument, proceeds along the following lines. First, Manning correctly notes that, in order to convict him of the crimes with which he was charged -8- 8 in the indictment, the jury was obliged, as a threshold __ _ _________ matter, to find that he was the person who disappeared into ______ the garage at 151 Doyle Avenue while holding the brown suitcase. Next, Manning observes that this finding necessarily must have been anchored upon determinations (1) ___________ that Detectives Lennon and Lussier were credible witnesses on this issue, and (2) that he and Duncan were not. Finally, Manning contends that the improper witness-vouching committed by the prosecutor, which was allowed by the trial court over his objection, both alone and in conjunction with the prosecutor's implication that there existed additional inculpatory evidence and the prosecutor's other inflammatory rhetoric, so compromised the jury's ability to make these essential and liminal credibility determinations that his trial was rendered fundamentally unfair. We find Manning's reasoning to be persuasive. We begin by laying the groundwork for our analysis. First, we think that the First and Second Passages contain improper witness-vouching by the prosecution. See, e.g., ___ ____ United States v. Innamorati, 996 F.2d 456, 482 (1st Cir.) _____________ __________ (prosecutor may not vouch for government witnesses), cert. _____ denied, 114 S. Ct. 409 and 114 S. Ct. 459 (1993); United ______ ___ ______ States v. Martin, 815 F.2d 818, 821-23 (1st Cir.), cert. ______ ______ _____ denied, 494 U.S. 825 (1987). Next, we believe that the Third ______ and Fourth Passages include improper appeals to the jury to -9- 9 act in ways other than as a dispassionate arbiter of the facts. See, e.g., United States v. Young, 470 U.S. 1, 17 ___ ____ _____________ _____ (1985) (prosecutor erred in telling jury to "do its job"); United States v. Mandelbaum, 803 F.2d 42, 44 (1st Cir. 1986) ______________ __________ (prosecutor erred in urging jury to "do its duty"). Finally we think it rather obvious that, when read in context, the prosecutor's comments in the Second Passage were an attempt to counter defense counsel's anticipated argument relating to the lack of fingerprint evidence on the items seized from the brown briefcase. Insofar as the comments were intended to relieve the jury of any misapprehension that there were no __ fingerprints on these items, these comments were not improper. Given that defense counsel had not suggested that the partial prints were not Manning's, cf. Young, 470 U.S. at ___ _____ 11-14 (discussing the "invited response" doctrine), however, the insinuation that the partial prints were inculpatory, which we believe inhered at least in the prosecutor's statement that "we have to be fair, we have to be positive," was impermissible. See e.g., United States v. Udechukwu, 11 ___ ____ ______________ _________ F.3d 1101, 1106 (1st Cir. 1993) (prosecutor may not imply that the government has inculpatory information that is not in evidence); United States v. Smith, 982 F.2d 681, 683 (1st _____________ _____ Cir. 1993) (similar).1 ____________________ 1. Additionally, we note that the improper arguments challenged on appeal are by no means the only inappropriate comments made to the jury by the prosecution during closing -10- 10 We also feel constrained to express our belief that the government's overreaching in this case was not entirely limited to the prosecutor's conduct at trial. While we acknowledge that the government was forthright in admitting that the prosecutor engaged in impermissible witness- vouching, we are surprised at several of the other positions staked out in the government's appellate brief. First, we are hard-pressed to comprehend, let alone agree with, the ____________________ arguments. By way of illustration, we offer the following passage where the prosecutor described his view of the "roles" played by the judge, jury, and, especially, defense counsel in a criminal trial: [PROSECUTOR]: We all play roles in this trial. You have seen what the Judge does and ruled on the law [sic]. As a jury, you serve a role, a function in this case too, you represent the people of the United States, the citizens of the State of Rhode Island. By your verdict you will speak for those citizens. By your verdict you will determine--- [DEFENSE COUNSEL]: I object to that. THE COURT: Just a moment. The jury will make the decision among themselves based on the instructions and the evidence they've heard. [PROSECUTOR]: Yes, your honor. You are fact finders and in order to find the facts one of the things you have to do is to decide which of the facts are true. You will have to assess the credibility of the witnesses. Some prosecutors get up and say that the role of defense attorney is to cloud the issues or make smoke screens. I liken them to Shakespeare's players, full of sound and fury signifying nothing . . . . -11- 11 government's characterization of the Second Passage, "in full context," as an effort to suggest "that prosecution witnesses had not created false evidence" (a claim the defense never made). Instead, as noted above, we think it plain (1) that the government was responding to defense counsel's anticipated argument that the jury should consider the absence of probative fingerprint evidence on the items found in the brown briefcase to be exculpatory, and (2) that, in stating that the prosecution "ha[s] to be fair" and "has to be positive," the prosecutor went too far and hinted that the partial prints tended to inculpate Manning. The government's references to extra-circuit caselaw and strained attempt to distinguish the inflammatory rhetoric here from the cases cited by Manning also strike us as inappropriate. By now, we think it should be beyond question that, in this circuit at least, arguments urging a jury to act in any capacity other than as the impartial arbiter of the facts in the case before it are improper. See ___ Mandelbaum, 803 F.2d at 44; cf. Arrieta-Agressot v. United __________ ___ ________________ ______ States, 3 F.3d 525, 529-30 (1st Cir. 1993) (inflammatory ______ arguments distract jury from the only issue presented in a ____ case: whether the evidence establishes guilt beyond a reasonable doubt). We turn now to our analysis. In this circuit, we have identified several factors relevant to a determination -12- 12 of whether prosecutorial misconduct has "`so poisoned the well,'" see United States v. Hodge-Balwing, 952 F.2d 607, 610 ___ _____________ _____________ (1st Cir. 1991) (quoting United States v. Capone, 683 F.2d ______________ ______ 582, 586-87 (1st Cir. 1982)), that a new trial is required. Although we have used slightly varying terminology in describing these factors, the common denominators are (1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant. See, ___ e.g., Udechukwu, 11 F.3d at 1106; Arrieta-Agressot, 3 F.3d at ____ _________ ________________ 528-30; Hodge-Balwing, 952 F.2d at 610; United States v. _____________ _____________ Quesada-Bonilla, 952 F.2d 597, 601-02 (1st Cir. 1991); _______________ Capone, 683 F.2d at 585-86. These factors guide our ______ conclusion as to whether the misconduct likely affected the trial's outcome. E.g., Udechukwu, 11 F.3d at 1106; Arrieta- ____ _________ ________ Agressot, 3 F.3d at 528.2 ________ ____________________ 2. This line of authority, which derives from Capone, also ______ often speaks of the need to deter future prosecutorial misconduct, e.g., Udechukwu, 11 F.3d at 1106; Quesada- ____ _________ ________ Bonilla, 952 F.2d at 602; United States v. Brown, 938 F.2d _______ _____________ _____ 1482, 1489 (1st Cir.), cert. denied, 112 S. Ct. 611 (1991), _____ ______ Capone, 683 F.2d at 586, as an additional legitimate basis ______ for reversal. As we have previously noted, however, see ___ Smith, 982 F.2d at 686 n.8; United States v. Osorio, 929 F.2d _____ _____________ ______ 753, 763 (1st Cir. 1991), and as the government argues here, our power to act solely on this basis has, at the least, been significantly circumscribed by the Supreme Court, see United ___ ______ States v. Hasting, 461 U.S. 499, 506 (1983) (use of ______ _______ supervisory power to deter prosecutorial misconduct inappropriate where error in case-at-bar was harmless). At any rate, while we fervently hope that our decision might -13- 13 In this case, we think that all of these factors militate in favor of reversal. The prosecutorial overreaching that took place here, while certainly not conscience-shocking, was pervasive. Moveover, it occurred during closing arguments -- the last words spoken to the jury by the trial attorneys -- and in no way was provoked by improper arguments of defense counsel. Cf., e.g., United ___ ____ ______ States v. Machor, 879 F.2d 945, 956 (1st Cir. 1989), cert. ______ ______ _____ denied, 493 U.S. 1081 (1990) and 493 U.S. 1094 (1990). ______ ___ More importantly, the district court not only failed to give curative instructions to counter the improper First and Second Passages, but it also tacitly indicated that the arguments in these Passages were proper by overruling defense counsel's contemporaneous objections to them.3 As a result, we think it likely that the jury inferred that Detectives Lennon and Lussier, as both law enforcement officials and prosecution witnesses, could properly be _____ considered as having a heightened duty to testify honestly. ____________________ have the effect of deterring prosecutors from straying into forbidden territory in the future, we emphasize that today's result is in no way informed by a deterrent animus. 3. With regard to the Third and Fourth Passages, while failing to tell the jury to disregard the prosecutor's comments, the district judge did remind the jury that its ___ responsibility was to find the facts. Thus, we think it unlikely that a significant amount of prejudice was engendered by the inflammatory rhetoric in those Passages. Accordingly, we restrict our analysis to the likely effects of the witness- vouching and hints at the existence of additional inculpatory evidence in First and Second Passages. -14- 14 Of course, such an inference undermines the impartiality with which the jury is supposed to make credibility determinations.4 Moreover, as we have stated, we think that the jury could have inferred from the "we have to be fair, we have to be positive" comments that the partial fingerprints on the items in the brown briefcase were Manning's. This leads to our final and most important point. While there may have been abundant evidence in this case that Manning was a drug dealer and that the drug paraphernalia seized at 151 Doyle Avenue was Manning's, the question of whether Manning committed the crimes with which he was charged in the indictment (i.e., possession of the contraband __ ___ __________ items seized from the brown briefcase) turned entirely on ________ whether, with regard to the issue of who carried the brown briefcase into 151 Doyle Avenue, the jury believed Detectives Lennon and Lussier or whether it believed Manning and Duncan. In our view, each of the witnesses gave a plausible account on this threshold question; that is to say, neither version of who was carrying the briefcase was inherently unlikely to __________ ____________________ 4. In so stating, we obviously are unconvinced by the government's argument that the district court's admonition, in its final instructions, that "the United States Government stands no higher before this Court than does Defendant" was sufficient to cure both the witness-vouching in the First and Second Passages and the effect of the court's overruling of defense counsel's contemporaneous objections. Indeed, this instruction, referring as it does to "the United States Government," in no way rebuts the above-noted implication that Detectives Lennon and Lussier, as Providence police __________ officers, had a heightened duty to testify honestly. -15- 15 be true. Given this, and given the further fact that we are precluded from making independent credibility determinations on appeal, see United States v. Alvarez, 987 F.2d 77, 83 (1st ___ _____________ _______ Cir.), cert. denied, 114 S. Ct. 147 (1993), the question _____ ______ before us really is whether the prosecutorial misconduct in the First and Second Passages (which, as we have stated, significantly interfered with the jury's ability to make an essential and liminal credibility determination) was likely to have affected the trial's outcome, see, e.g., Udechukwu, ___ ____ _________ 11 F.3d at 1106; Arrieta-Agressot, 3 F.3d at 528. We are ________________ compelled to conclude that this question must be answered in the affirmative. Accordingly, Manning is entitled to a new trial. III. ____ CONCLUSION __________ Nearly sixty years ago, the Supreme Court stated: The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods -16- 16 calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. Berger v. United States, 295 U.S. 78, 88 (1935). For the ______ _____________ third time in the last six months, we find ourselves in the regrettable position of vacating a conviction because a United States Attorney has failed to honor sufficiently these precepts. See Udechukwu, 11 F.3d at 1106; Arrieta-Agressot, ___ _________ ________________ 3 F.3d at 530; see also United States v. Moreno, 991 F.2d ___ ____ ______________ ______ 943, 949-50 (1st Cir.) (Torruella, J., dissenting) (arguing, inter alia, that the prosecutorial misconduct in that case _____ ____ warranted reversal of defendant's conviction), cert. denied, _____ ______ 114 S. Ct. 457 (1993). Vacated and remanded. _______ ___ ________ -17- 17