USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-2017 LLOYD MATTHEWS, Plaintiff, Appellee, v. PAUL RAKIEY, ET AL., SUPERINTENDENT AT MCI-WALPOLE, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Mark L. Wolf, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Linda Nutting Murphy, Assistant Attorney General, with whom Scott ____________________ _____ Harshbarger, Attorney General, was on brief for appellant. ___________ Stephen Hrones, orally; Lloyd Matthews on brief pro se for _______________ appellee. _____________________ May 8, 1995 _____________________ STAHL, Circuit Judge. Petitioner Lloyd Matthews STAHL, Circuit Judge. _____________ was convicted in August 1987 in a Massachusetts trial court of rape, assault in a dwelling with intent to commit a felony, and indecent assault and battery. After exhausting his remedies in the state courts, Matthews sought a writ of habeas corpus in the district court pursuant to 28 U.S.C. 2254, claiming that he was denied his Sixth Amendment right to effective assistance of counsel. After referring the matter to a magistrate-judge for a report and recommendation, the district court granted the petition, and this appeal followed. For the reasons discussed below, we reverse. I. I. __ BACKGROUND BACKGROUND __________ A. Pretrial Events ___________________ On May 15, 1986, Brenda Barbosa, who was fourteen years old at the time, reported to Boston police that she had been attacked in her bedroom by a man with a knife earlier that morning. Later that same day, after viewing several hundred photographs in police identification books, Barbosa identified Matthews, who wears his hair in a distinctive "dreadlocks" style and was so depicted in the photograph, as the man who had attacked her. The police obtained an arrest warrant but, although they knew Matthews's address, made no immediate attempt to question him about the incident or take him into custody. Matthews was eventually arrested on May -2- 2 28, 1986, when a patrolling officer who had stopped to question Matthews on the street about unrelated conduct discovered the outstanding warrant. The incident report filed by the Boston police officer who first responded to Barbosa's call (the "incident report") contains no mention of a sexual assault. The officer's account of his interview with Barbosa, conducted within two hours of the incident, is as follows: [T]he victim . . . stated while she was sleeping the suspect entered the victim's bedroom and jumped on top of her. The victim stated the suspect had a kitchen knife and told her, "Be quiet, I don't want nothing from you, you won't get hurt." The victim further stated the suspect then pulled the victim from her bed and ordered the victim to stand in a corner then the suspect ordered the victim to stand against a wall. The victim then stated the suspect started looking through the rooms on all three floors. The victim further stated the suspect then told the victim to close the door behind him when he left and not to tell anyone about him. The victim stated she complied and the suspect fled on foot to a yellow m/v then fled in an unknown direction. The incident report includes a description of the alleged assailant as a black male, 5'10", black hair and brown eyes, wearing a black hat, brown leather jacket and black pants. It does not indicate whether Barbosa mentioned to the officer that her attacker had dreadlocks. Matthews was initially charged with armed assault in a dwelling with intent to commit a felony, and with -3- 3 breaking and entering. A probable cause hearing was conducted in Roxbury District Court on August 4, 1986. There is no transcript of the hearing in the record. Although the breaking and entering charge was dropped following the hearing, Matthews was bound over on the armed assault charge. Subsequently, grand jury proceedings were initiated on that charge as well as two new charges apparently based on Barbosa's testimony at the probable cause hearing: rape of a child with force, and indecent assault and battery on a person under 14. At the grand jury proceeding, Boston Police Detective William Ingersoll -- who oversaw the photo identification procedure in which Barbosa picked out Matthews -- testified as follows: A. . . . At the probable cause hearing in the Roxbury Court I was not present . . . and I received a message following that hearing from the District Attorney who stated to me that during the probable cause hearing the victim -- who was afraid to tell her mother and the police -- that at the time during this breaking and entering and assault, the defendant did assault this young girl, again, 14 years of age. Q. In what manner? A. I believe it was placing the fingers to her vagina, more or less just the fingers. She did not go to the hospital to be examined. Again, she is a young Spanish girl and was ashamed even to tell the mother. There was no complaints at that time for rape in the Roxbury District Court against him. I was unaware of this fact. -4- 4 Barbosa also testified before the grand jury. Certain aspects of her account of the May 15 events were not entirely consistent with the second-hand version contained in the incident report: A. Well, I was sleeping and I heard the bedroom door, and when I looked up I seen this man and he jumped on top of me and put me against the wall . . . . . . . . Q. Did he take anything? A. The only thing I found missing was my leather coat, and stuff was in the first floor. Q. Do you know whether he took that coat? A. I don't really know, but he must have took it because I couldn't find it; I looked for it; I asked my sister if she let someone use it; she said, no. . . . . Q. Now, when this man jumped on you, did he touch you in any way? A. Yes. Q. And what part of your body did he touch? A. He touched me, all parts. Q. You[r] chest and your vaginal area? A. Yes, sir. Q. Did he put his fingers into your vagina at some time? A. Yes. -5- 5 Q. When the police came that day, did you tell the police that day? A. I told them everything that happened, like in a way I was -- when I went to the police station to look at the pictures I told them what happened. B. The Trial _____________ On August 17, 1987, Matthews was brought to trial on the rape, armed assault and indecent assault charges. The prosecution called two witnesses, Barbosa and Ingersoll, with Matthews as the only defense witness. Because we must evaluate the alleged constitutional deficiencies of counsel's performance in light of his "overall performance throughout the case," Strickland v. Washington, 466 U.S. 668, 689 __________ __________ (1984), we provide an extensive summary of the trial record. 1. Opening Statements ______________________ In his opening statement, the prosecutor told the jury that immediately after Barbosa's attacker left her apartment, Barbosa ran next door "and told her sister-in-law what had happened." Despite strong evidence that Barbosa never told anyone that she had been sexually assaulted or raped until she testified at Matthews's probable cause hearing, 81 days after the incident, Matthews's trial counsel, Kenneth D'Arcy, did not challenge the prosecutor's assertions. D'Arcy made clear from the outset that instead of challenging Barbosa's allegations, he would try to show that she had mistakenly picked Matthews out of the police -6- 6 photograph books because of his distinctive "dreadlocks" hairstyle. D'Arcy told the jury that "[t]here's no question in my mind and Mr. Matthews' mind that Brenda Barbosa was attacked in her bedroom on May 15th. But you're going to hear from Mr. Matthews that on May 15th he was working in his father's garage." 2. Barbosa's Testimony _______________________ Barbosa, who had reached sixteen years of age by the time of the trial, testified on direct examination that she was asleep in her bed about 8:30 a.m. on May 15, 1986, when she was awakened by a man entering her room. When she looked up, she saw the man had a knife. The man got on top of her, put the knife to her throat and told her to be quiet or he would kill her. The man touched Barbosa's breasts and put his finger inside Barbosa's vagina. Then, the man pulled Barbosa off the bed and placed her against a wall, telling her to stay there while he walked through other rooms of the house. Barbosa said he took her leather coat, although she did not say whether she saw him carry the coat away. Barbosa identified Matthews as the man who attacked her. The following exchange then ensued: Q. You went to your sister-in-law's; did you tell her what happened? A. Yes. Q. Did you call the police? A. Yes, I did. -7- 7 Q. You reported this to the police, didn't you? A. Yes. Q. Now, at some point during the day did you have an opportunity to meet with Detective Ingersoll of the Boston Police? A. Yes, I did. Q. Did you go over what happened with him? Did you tell him about that? A. Yes, I did. Barbosa then testified as to how she picked Matthews's photograph out of the police books. She said that she got a good look at her attacker's face; that her attacker had long hair pinned up under a gray beret-like hat; and that she had described the man to police as being about five-foot- eleven with dreadlocks and a hat. Barbosa also testified that a few days after the attack, the same man came to her door and rang the doorbell. She said that she "went crazy, and . . . started crying, and he just left." In his cross-examination, D'Arcy quickly began his attempt to show that Barbosa had immediately zeroed in on the fact that the assailant had dreadlocks: Q. This man came in, and what's the first thing you remember about his physical appearance when you saw him in your bedroom? A. I don't really understand what you mean. Q. What was the first physical characteristic that you saw in this man -8- 8 when you saw him in the bedroom and he woke you up and you were afraid; what's the first thing you recognized about him? A. The knife. Q. And then what about a physical characteristic? After you saw the knife, and you saw this man with the knife, what physical characteristic did you remember? A. I still don't understand what you mean. Q. When you describe people -- A. Yes. Q. -- you describe people as short -- A. Oh, you want me to describe him, like when he first came in? Q. Yes, when you first saw this man and you saw the knife, and you got over the shock of the knife, and you saw that this man was in your bedroom and he didn't belong there -- A. Yes. Q. -- what physical characteristic of this man did you first remember -- first remember? A. The way he looked, his face, and the way he was like coming towards me. Q. What about his hair style? A. I recognized that too. Q. The dreadlocks? A. Yes. D'Arcy then questioned Barbosa about her identification of Matthews as her attacker. He elicited the -9- 9 not-too-helpful testimony that she had seen other people with dreadlocks before encountering Matthews, but that they did not look like him; that she identified Matthews the same day as the alleged attack; that she "could never forget his face"; and that she had picked the picture out after viewing it for just half a second. Before he concluded this line of questioning, D'Arcy inartfully allowed Barbosa one more opportunity to tell the jury how certain she was of her identification of Matthews: Q. There's no question in your mind that this is the man that broke into your house and had a knife in his hand? A. That's the man. At that point, D'Arcy changed the focus of his examination and began to question Barbosa's account of what had happened and her veracity: Q. Then did you tell Detective Ingersoll at that time, you know, that he touched your private parts at all? A. I told him what had happened. Q. Well, did you tell him, you know, as you told the jury today, that the man grabbed your private parts? A. I only told him what he was asking me. Q. Is it fair to say, Brenda, that you really didn't tell Detective Ingersoll everything that happened when you were going over the pictures? A. I told him most everything that happened. -10- 10 Q. But you didn't tell him about the fact that this man touched your private parts? A. No, but I told the other cops when they came. Q. When? A. When it first happened, the cops that came over to the house. It's right in the report. Q. You told them that he had grabbed you? A. Yes. Q. And touched your private parts, right? A. Yes. Although these last four answers were apparently untrue, D'Arcy did not directly confront Barbosa with any prior statements or other evidence contradicting her testimony. 3. Ingersoll's Testimony _________________________ Ingersoll testified that Barbosa and her sister-in- law, Carmen Barbosa, came to his office on the afternoon of May 15 to view photographs. Ingersoll said he "tried to determine what exactly had happened" and then began showing Barbosa books containing photographs of black men of the approximate age that Barbosa had described. Ingersoll testified that, in his estimation, Barbosa viewed "about 600, 700 photographs." When she turned to the photograph of Matthews, Ingersoll said, Barbosa "became very excited. `That's him.' She got up from the table, jumping up and -11- 11 down. `That's him, that's him.'" Ingersoll said that the picture of Matthews matched the general description contained in the original incident report, and that during her conversation with Ingersoll prior to viewing the photographs, Barbosa had mentioned that the attacker had dreadlocks. On cross-examination, D'Arcy resumed his strategy of trying to show that Barbosa had picked out Matthews's picture because of his dreadlocks: Q. Now, when Brenda Barbosa came in the station, she gave you a description of the man that was in her home earlier, had dreadlocks; do you remember? A. That's correct. Q. You don't have any books or just males with dreadlocks, though; right? A. No, sir. The space just doesn't allow it. . . . . Q. Did you look at any of the photos that she looked at, looking for men with dreadlocks? A. Not at that particular time, no, sir. I basically put a lot of the photographs in the books when we receive them for identification. I don't make a special notice of dreadlocks. Q. Do you know how many men had dreadlocks in the photos before Miss Barbosa picked Lloyd Matthews' picture? A. I have no idea. Q. It could have been any of them? -12- 12 A. It could have been any, could have been a few, could have been one. I don't know. Q. Could have been one, right? A. The books are set up, Mr. D'Arcy, only by age, sex and race; that's it. Q. So you're testifying today that Mr. Matthews could have been the first male that had dreadlocks in those photo books; correct, Detective? A. Could have been. Upon further questioning by D'Arcy, Ingersoll testified that he "kn[e]w for a fact that there are many dreadlocks" in the photograph books, and that he had "had every confidence in the world that she would run into dreadlocks." He also testified that he did not personally arrest Matthews, nor did he immediately have police officers go to Matthews's home to arrest him once an arrest warrant issued. Instead, Ingersoll said, he told another police officer with duty in Matthews's neighborhood of the warrant, and that officer told Ingersoll "that he would lock him up when he sees him." Matthews was ultimately arrested when police stopped to question him on a Roxbury street on May 28, nine days after the warrant had issued and thirteen days after the crimes allegedly took place. 4. The Defense _______________ After the prosecution rested, D'Arcy notified the court that Matthews was "very upset" with D'Arcy for not -13- 13 wanting to recall Barbosa to the stand to question her about discrepancies between her trial testimony and prior statements. D'Arcy told the court: But in my perusal of the grand jury minutes, I mean -- you know, this is an identity type of case, your Honor. I know what the girl has been through. It's obvious that a crime was committed. My client's defense is that it's a misidentity. She testified there was no question in her mind it was him. Whether she came downstairs with him or looked out the window, there's sort of minor discrepancies as far as I'm concerned. It's a disadvantage when you try to examine young ladies because of the fact that she's highly emotional. I just feel -- I disagree with my client. I told him I didn't want to recall Brenda Barbosa. You know, the bottom line is that I'm trying the case and he isn't. But I just want the record to reflect that, you know, he's been more than vociferous that he doesn't agree with my strategy, shall we say. D'Arcy then called Matthews to the stand. Matthews testified that he had worked at his "father" John Wornum's1 auto body shop in Roxbury on and off for years. From April until July of 1986, Matthews testified, he and a friend, Chris Cross, were rebuilding a junked car that they eventually sold to a friend of Wornum. Matthews could not say specifically that he was working at the shop on the  ____________________ 1. Wornum explained in a post-trial affidavit that he is a long-time friend of Matthews's family and that Matthews would sometimes call him his "uncle" or "father" even though the two are not related. -14- 14 morning of May 15, 1986, but he said that it was his usual practice to open up the shop each morning at 7:30 a.m. On cross-examination, Matthews explained that he was paid in cash and had no records or pay stubs proving that he worked at the body shop. John Wornum, Matthews testified, had been in Georgia for several months; Wornum's son, Rufus Wornum, was busy running the shop, and Chris Cross had agreed to testify on his behalf but had since joined the Marines. Matthews also testified that he had no records pertaining to the rebuilt car, and that he did not know the person who bought it other than that he was a friend of John Wornum. The prosecutor's final exchange with Matthews was as follows: Q. You're not specifically testifying as to where you were on the morning of May 15th, 1986; are you? A. No, sir. 5. Closing Arguments _____________________ Unlike his opening, D'Arcy's summation contained at least some hints to the jury that perhaps Barbosa's story of what happened to her was not entirely truthful. After incorrectly telling the jury that they had "seen a girl fourteen years old," D'Arcy urged the jurors not to let their emotions affect their deliberations about what happened to this girl, if in fact it did happen. . . . . . . . You have to decide did Brenda Barbosa really tell the truth of everything that happened. Did she wake -15- 15 up and see a fellow there with a knife? Was it somebody maybe she -- she didn't go to school that day -- that maybe a fellow that she was going to go to school with -- maybe something got carried on that she didn't expect and she panicked, because she lived right -- a relative lived right around the corner. Did it happen to her? Did she tell Officer Ingersoll that she had been sexually assaulted? D'Arcy did not, however, point to any evidence or prior statements suggesting that Barbosa was not truthful. Instead, he discussed at length how a "hysterical" Barbosa had zeroed in on Matthews's photograph "[a]s soon as she saw the dreadlocks," and how the failure of the police to arrest Matthews as soon as Barbosa had identified him was not "fair play." The near-two-week delay in Matthews's arrest left Matthews virtually no chance to prove that he was at the body shop while Barbosa allegedly was attacked, D'Arcy argued. Toward the end of his argument, D'Arcy again suggested that this was not just a case of mistaken identity, but also of truthfulness: Did you hear any hospital testimony regarding any physical disability with Brenda Barbosa? Because I suggest she didn't tell anybody the day she picked out Mr. Matthews' picture. Did you hear any evidence of a lock being broken or of any damage to her house that allowed this stranger to come in? No. And again: Ladies and gentlemen, I suggest that all of these gaps create some doubt, and -16- 16 that's the magic word, "doubt", beyond a reasonable doubt. That's what you have to be convinced, that Lloyd Matthews was the individual that came into a room, and if in fact there was a breaking and entering, and indecently assaulted Brenda Barbosa, if in fact she was, and stuck his finger in her vagina, if in fact that was done. Because I suggest a fourteen year old that this has really happened to, when she went running out to her relation, she would have said, "I've been violated," and she would have been brought right to the hospital for examination. You know, fourteen years old, if this is what happened. Then from the hospital the police would have got up there, and then maybe if she had told all the truth right away they would have picked up or investigated Lloyd Matthews that day. Had that occurred, D'Arcy argued, Matthews could have proved where he was the morning of May 15 and refuted the notion that he was the dreadlocked man who had attacked Barbosa. __ The prosecutor recounted how certain Barbosa was of her identification and the substantial opportunity she had had to see him when he entered her room and was on top of her. He told the jury to consider "the sincerity of her emotions" in testifying: Keep that picture of her in your mind. Those were not crocodile tears that came out of her eyes. Those were genuine tears based on honesty and certainty. Brenda Barbosa came to this court to seek justice, and you can give her justice. She is the victim. -17- 17 In contrast to Barbosa's sincerity, the prosecutor pointed to the "vague" nature of Matthews's testimony: "That he worked at a vague garage, working on a vague Lincoln, making vague repairs. Nothing to back it up." In the end, the prosecutor said, the issue for the jury was one of credibility: "You have to make a determination of who to believe; who was honest; who was sincere; who was certain; and who was vague." The jury deliberated for about four-and-one-half hours before returning verdicts of guilty on all three counts. Matthews was sentenced to concurrent state prison terms of 12 to 20 years, 10 to 15 years, and 4 to 5 years. C. Post-Conviction Proceedings _______________________________ Matthews moved for a new trial on a number of grounds, including ineffective assistance of counsel and newly discovered evidence -- namely, an affidavit from John Wornum to the effect that he would corroborate Matthews's testimony that in May 1986, he normally opened the body shop at 7:30 in the morning, and that on May 15, 1986, Matthews "would have been working" at the shop when Barbosa was allegedly attacked. The trial court denied the motion. The Massachusetts Appeals Court affirmed the conviction, and the Supreme Judicial Court denied Matthews's petition to obtain further appellate review. Having exhausted his state remedies, Matthews filed his petition for habeas corpus in the district court on -18- 18 August 30, 1990. Matthews argued that D'Arcy committed numerous errors that deprived him of effective assistance of counsel: 1) failure to impeach Brenda Barbosa with her prior inconsistent statements; 2) failure to make an effective closing argument; 3) failure to have Matthews's only alibi witness, John Wornum, appear and testify at trial; and 4) failure to prepare adequately for trial and to object to improper leading questions and to the prosecutor's closing argument. The respondent argued that D'Arcy's alleged "errors" were tactical or strategic choices made so as not to undermine D'Arcy's strategy of pursuing the "dreadlocks" defense. An evidentiary hearing was convened on January 15, 1993, but neither party chose to present evidence beyond that already contained in the record. On March 17, 1993, a United States Magistrate Judge agreed with virtually all of Matthews's assertions and, finding that "the culmination of errors taken as a whole . . . establishes trial counsel's ineffective assistance in this case," recommended that the writ be allowed. The district court adopted the magistrate-judge's recommended result but not her reasoning. The court found that D'Arcy had adopted a professionally responsible strategy by not contesting that Barbosa was sexually assaulted by a black man with dreadlocks and by seeking instead to suggest -19- 19 that, in her subsequent hysteria, she mistakenly selected Matthews's photograph because his was the first picture of a man with dreadlocks. The court held that because D'Arcy relied on the mistaken-identity defense, however, his failure to investigate Matthews's only alibi witness, John Wornum, or to seek a continuance in order to do so, was not ascribable to any strategic reason and therefore constituted constitutionally deficient assistance of counsel that prejudiced Matthews. The respondent appealed, arguing that Wornum's affidavit contained no indication that his testimony would provide an alibi for Matthews. Matthews filed two briefs pro se, one as appellee urging that we affirm the district court's order, and another as appellant asking that we grant the petition on the grounds recommended by the magistrate- judge but rejected by the district court. II. II. ___ DISCUSSION DISCUSSION __________ A. Governing Principles ________________________ To establish a Sixth Amendment violation of the right to effective assistance of counsel, a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that prejudice resulted. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Scarpa __________ __________ ______ v. Dubois, 38 F.3d 1, 8 (1st Cir. 1994), cert. denied, 115 S. ______ _____ ______ -20- 20 Ct. 940 (1995). Among the basic duties of an attorney is "to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Strickland, __________ 466 U.S. at 688. In evaluating the reasonableness of an attorney's performance, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at ___ 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). ______ _________ We must make "every effort . . . to eliminate the distorting effects of hindsight" and to evaluate counsel's conduct from his or her perspective under the circumstances as they existed at that time. Id. ___ We say that a defendant was prejudiced by his lawyer's substandard performance if he can show that, but for counsel's errors, "there is a reasonable probability . . . that the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."2 Id. at 694. See ___ ___  ____________________ 2. Counsel for the respondent, an assistant attorney general for the Commonwealth of Massachusetts, dropped the "reasonable probability" language from this standard and misleadingly suggested to us that Strickland requires the __________ defendant to prove that "but for" counsel's inadequacies, the verdict would have been different. Brief for the ________________ Respondent/Appellant at 9. Strickland expressly rejected a ____________________ __________ -21- 21 also Scarpa, 38 F.3d at 8. "In making this determination, a ____ ______ court . . . must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695. As "both __________ the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," id. at 698, we review these issues de novo. Scarpa, 38 F.3d ___ __ ____ ______ at 9. B. D'Arcy's Performance ________________________ Matthews concedes that the central issue in the case was the identity of the attacker. What he challenges is D'Arcy's decision to use the "dreadlocks" defense to attempt to persuade the jury that Barbosa had misidentified Matthews, rather than focusing on the apparent inconsistencies of her prior statements and her failure to report the alleged rape immediately. D'Arcy's decision to employ the dreadlocks strategy was not a professionally reasonable choice, Matthews claims, because D'Arcy possessed no evidence that Barbosa had picked Matthews's photograph out because of his hairstyle. D'Arcy had no knowledge of how many pictures of men with dreadlocks Barbosa had seen before identifying Matthews, and the police report contains no indication that Barbosa had mentioned dreadlocks in her initial description of the attacker, thus undermining the argument that the hairstyle  ____________________ more-likely-than-not outcome-determinative standard. 466 U.S. at 693. -22- 22 was the predominant feature. Therefore, Matthews argues, instead of concealing the fact that Barbosa did not mention dreadlocks initially, D'Arcy should have driven this point home to the jury and called into question Barbosa's powers of observation. Furthermore, Matthews maintains, D'Arcy should have questioned Barbosa about the discrepancy between the police report's version of when she initially saw her attacker, and her own testimony -- i.e., whether she was awakened by a man entering her bedroom and jumping on top of her, or whether she heard the door, and thus had a longer time to view her attacker -- and he should have called into question Barbosa's truthfulness generally by impeaching her regarding her delay in reporting the alleged rape. Finally, Matthews argues, D'Arcy should have marshalled an effective closing argument underscoring the inconsistencies in Barbosa's prior statements, rather than delivering a disjointed speech that, Matthews claims, bordered on an invitation to convict. We disagree that D'Arcy's strategic choice to employ the "dreadlocks defense" was professionally unreasonable. That it was not ultimately a winning strategy is of no moment in assessing its reasonableness at the time, see United States v. Natanel, 938 F.2d 302, 310 (1st Cir. ___ _____________ _______ 1991), cert. denied, 502 U.S. 1079 (1992). D'Arcy had little _____ ______ to work with, given the persuasive power of Barbosa's -23- 23 identification testimony and the inherent weakness of Matthews's alibi, and he chose what he thought was a reasonable line of argument that carried with it little risk of alienating the jury. A strategic choice that would have included more direct attacks on Barbosa's credibility and, inevitably, her character, would have carried with it a far greater risk of offending the jury. Thus, we hold that, in choosing to emphasize Matthews's dreadlocks as the reason that Barbosa identified him as her attacker, rather than highlighting alleged inconsistencies in Barbosa's trial testimony and her prior statements, D'Arcy employed a professionally reasonable strategy and did not, by virtue of that choice alone, deprive Matthews of effective assistance of counsel. Matthews also argues, however, that D'Arcy did in fact challenge Barbosa's credibility -- by questioning her about her apparent failure to report immediately that she was raped, and by arguing this point to the jury -- and that therefore D'Arcy's failure to impeach Barbosa more directly, or at least to introduce the impeaching evidence through another witness, cannot be deemed a strategic choice. We agree that the record makes clear that D'Arcy did attempt to elicit from Barbosa an admission that she did not immediately report the rape. Indeed, D'Arcy successfully forced Barbosa to change her testimony and admit that she had not, in fact, -24- 24 told Detective Ingersoll about the rape. The question we must address, however, is whether, once Barbosa went on to testify that she had told the police who had initially responded to her call that she was raped, and that "it's right in the report," D'Arcy's failure to demonstrate to the jury that these statements were apparently untrue constitutes ineffective assistance of counsel. Put another way, the issue is whether it may be considered acceptable trial strategy to have questioned Barbosa about her delay in reporting the rape without impeaching her when the answers she gave were not favorable to Matthews. Bearing in mind that the defendant must overcome "a strong presumption" that D'Arcy's conduct "falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, we are unable to come to any __________ conclusion other than that Matthews has not done so here. To be sure, there were points to be scored against Barbosa's credibility after she insisted that she had in fact immediately told police that she had been raped. D'Arcy could have confronted her with the incident report containing no mention of a rape, or he could have asked her about her testimony at the probable cause hearing. He also could have questioned Ingersoll about when he first learned that Barbosa claimed to have been raped. But, as D'Arcy made clear to the trial judge at a sidebar conference following the close of -25- 25 the prosecution's case, Matthews's primary defense remained _______ that Barbosa had picked out the wrong assailant, and not that _____ she had not been attacked at all. While Barbosa's delay in reporting that she was raped might have affected the jury's _____ assessment of her overall credibility as a witness, we think this would be much more likely if the primary issue had been consent. Here, the primary issue, and the heart of the defense's theory, was not whether a crime occurred but rather _______ who committed it. Moreover, the record makes apparent that Barbosa was quite obviously upset on the witness stand as she retold her experience; this circumstance, along with Barbosa's youth (rendering her failure to report a rape immediately all the more explicable), diminishes the likelihood that the jury would doubt that such an attack occurred simply because Barbosa delayed in reporting it. D'Arcy had to balance the limited evidentiary value of Barbosa's delay against the danger of the jury misperceiving an impeachment attempt as badgering or callously tarnishing Barbosa. Another lawyer might have struck a different balance, but we do not find that D'Arcy's on-the-spot decision to let Barbosa's answer stand and argue the inference he had raised to the jury was "beyond the wide range of reasonable professional assistance."3  ____________________ 3. Our dissenting brother conveniently overlooks that part of Barbosa's identification testimony in which she claimed that Matthews made a second trip to her home, only to be -26- 26 The other alleged inconsistencies in Barbosa's statements that Matthews claims D'Arcy should have raised are trivial, and thus D'Arcy's decision not to question Barbosa about them was a sound tactical choice. That the incident report, prepared immediately after the attack, contains no mention of dreadlocks, is inconsequential in light of the fact that Barbosa told Ingersoll before viewing any photographs that her attacker had dreadlocks. Furthermore,  ____________________ dissuaded from entering by her frightened response to his appearance at her door. Given the strength of her identification of him as her assailant, it was essential that counsel try to deflate this aspect of Barbosa's testimony. Moreover, it is a misstatement to say that there was "irrefutable evidence" that Barbosa failed to report the rape for an eighty-one day period. While the initial police record does not indicate that a rape was part of the physical attack, and Ingersoll's grand jury testimony was that his ___ first knowledge of that part of the attack came as a result of the probable cause hearing, there is nothing in the record stating unequivocally that Barbosa had not told other authorities of the alleged rape prior to the probable cause hearing. Finally, we respond to our brother's assertion that we give "too much credence to certain ageist and sexist assumptions -- that it would be improper to question closely (and risk arousing the emotions of) a young female sexual assault victim . . . ." First, our assessment of the reasonableness of D'Arcy's strategy would be no different had the victim been a fourteen-year-old boy. Second, lawyers must devise their strategies in light of how real jurors ____ might react -- not necessarily politically correct ones. The dissent suggests that a lawyer who considers the unfashionable assumptions and reactions of jurors in crafting a strategy deserves less deference than does a lawyer who ignores them or decides that the jury will rise above them. We disagree. We do not dispute that D'Arcy could reasonably _____ have chosen a strategy involving more aggressive and complete impeachment; not doing so, in this case, was also within the ___ "wide range" of reasonable professional choices recognized by the Strickland Court. __________ -27- 27 to point out this "inconsistency" would have only weakened D'Arcy's argument that it was the dreadlocks that had in fact caused Barbosa to pick Matthews's picture out of the photograph books. As for the "inconsistency" between when Barbosa initially told police she was awakened and her testimony in court, we note that the incident report's statement that "while [Barbosa] was sleeping the suspect entered the victim's bedroom and jumped on top of her" is a hearsay account of what Barbosa said immediately after the _______ attack, and, even if true, would only have deprived her of a few seconds of the time she claimed to have viewed her attacker. She still was able to view him while he was on top of her; at various times while he searched the apartment; and when he returned to Barbosa's home on the weekend. Thus, D'Arcy's decision to eschew questioning on these matters was a sound trial tactic. Finally, we address the grounds on which the district court actually granted the writ: D'Arcy's failure to call John Wornum, or to request a continuance so that he could do so. Here, we disagree with the district court's conclusion; we cannot see how Matthews was prejudiced. Wornum's testimony would have corroborated Matthews's testimony in general -- i.e., that there actually was a Crossing Auto Body Shop, and that Matthews actually worked there, and perhaps even that he generally opened the shop -28- 28 early in the morning -- which would have taken some of the wind out of the sails of the prosecutor's closing argument, in which he cast doubt on the entirety of Matthews's testimony. Wornum's affidavit makes clear, however, that he could not provide an alibi for Matthews on the particular day ___ of the crime. Matthews argues that Wornum's testimony is all the more credible because he does not pretend to be able to say for sure where Matthews was on a particular morning several years ago. That may be true, but it is far less ___ probative of Matthews's innocence. Moreover, a jury might have drawn a negative inference from the things that Wornum's affidavit does not indicate he is willing to testify to: ___ namely, the identity of the purchaser of the car Matthews says he was rebuilding around the time of the crime, or any other information regarding the car's purchase and sale. Thus, while Wornum's testimony might have been, on balance, of marginal utility to Matthews, his affidavit does not create in us any belief that there is a reasonable probability that the outcome would have been different had he testified.4  ____________________ 4. We have also considered Matthews's claims that he was deprived of effective assistance of counsel by D'Arcy's "incoherent" closing argument, his lack of preparation and his overall performance throughout the course of the trial. Even if Matthews is correct that D'Arcy's performance in these areas was deficient, Matthews has not demonstrated, and the record does not lead us to believe, that the was a reasonable probability of a different outcome if D'Arcy had performed differently. -29- 29 IV. IV. ___ CONCLUSION CONCLUSION __________ For the foregoing reasons, we conclude that Matthews was not deprived of his Sixth Amendment right to effective assistance of counsel, and the decision of the district court is Reversed. Reversed. _________ Dissent follows. _______________ -30- 30 BOWNES, Senior Circuit Judge, dissenting. I agree BOWNES, Senior Circuit Judge ____________________ with the majority that D'Arcy's failure to call John Wornum, when examined in isolation, did not violate the Sixth Amendment. I strongly disagree, however, that the complained-of acts and decisions of D'Arcy, when viewed in the aggregate, "f[ell] within the wide range of reasonable professional assistance" and constituted "sound trial strategy." See Strickland v. Washington, 466 U.S. 668, 689 ___ __________ __________ (1984). Furthermore, I am convinced that, but for D'Arcy's unsound performance, "there is a reasonable probability that the result of the proceeding would have been different." Id. ___ at 694. I therefore dissent from the majority opinion. In explaining my dissent, I shall limit myself to three points not made in the extremely thorough and well-reasoned report and recommendation of Magistrate Judge Bowler, the relevant portion of which I attach as an appendix to my dissent. See ___ Matthews v. Rakiey, Civil Action No. 90-12111-WF (D. Mass. ________ ______ filed March 17, 1993). Magistrate Judge Bowler's opinion combines an accurate exposition of the facts with a correct statement of the applicable legal principles. I. I. __ The majority opinion makes clear that D'Arcy declined to submit irrefutable evidence, readily available to him, that Barbosa waited eighty-one days to report the rape and that Barbosa testified untruthfully as to when she first -31- 31 informed the police and her sister-in-law that she had been raped. In considering whether D'Arcy's inaction was substandard under Strickland's first prong, the majority __________ employs a false assumption. The majority excuses D'Arcy's tactics in part by pointing out that he pursued a misidentification defense (the "dreadlocks defense") and did not really challenge Barbosa's rape allegation. See ante at ___ ____ 25 ("Matthew's primary defense remained that Barbosa had picked out the wrong assailant, and not that she had not been _____ attacked at all. While Barbosa's delay in reporting that she was raped might have affected the jury's assessment of her _____ overall credibility as a witness, we think this would be much more likely if the primary issue had been consent. Here, the primary issue, and the heart of the defense's theory, was not whether a crime occurred but rather who committed it."). It _______ then concludes that, in the context of the misidentification/dreadlocks defense, D'Arcy's failure to expose the glaring inconsistencies in Barbosa's testimony and prior statements was not "beyond the wide range of reasonable professional assistance." Id. at 25-26. ___ Obviously, this line of reasoning tacitly assumes the soundness of D'Arcy's decision not to question whether Barbosa had in fact been raped. Such an assumption is not warranted in this case for the following reasons. First, the two defenses would not have been inconsistent. There would -32- 32 have been nothing inherently suspect about arguing that Barbosa had identified the wrong man and that she had not ___ been, or may not have been, raped. Second, there was significant evidence tending to undermine Barbosa's account of the sexual assault. Had the jury been fully apprised of the irregularities surrounding the reporting of the rape charge, it may well have concluded that it could not convict Matthews of rape beyond a reasonable doubt. Third, D'Arcy did argue to the jury, albeit as an afterthought, that ___ Barbosa may not have been raped. See id. at 15-16 ___ ___ (excerpting portions of closing argument where D'Arcy asks the jury to consider whether a rape took place). In view of this last fact alone, I am puzzled by the majority's conclusion that D'Arcy's refusal to buttress his argument with significant supporting evidence constituted "sound trial tactics." D'Arcy ultimately thought the "rape may not have happened" theory worth arguing; how then could it not have been worth supporting with evidence that was available? I do not think that the existence of one reasonable defense strategy, without more, establishes constitutionally effective representation. II. II. ___ I also disagree with the majority's conclusion that, within the confines of the misidentification/dreadlock defense, D'Arcy's failure to impeach Barbosa passed -33- 33 constitutional muster. The case hinged on Barbosa's credibility as a witness, and I simply do not see how it could have been "sound" for D'Arcy to fail to demonstrate to the jury that Barbosa had testified untruthfully on several very important matters (including when she first informed the police and her sister-in-law that she had been raped). He certainly could have done so sensitively and without suggesting improper motive on Barbosa's part. The omitted impeachment evidence could have been easily introduced as further confirmation of that which D'Arcy had already suggested to the jury: the trauma of awakening to find an intruder in the room quite reasonably rendered suspect Barbosa's powers of perception and recall. This leads to a second point. The majority, in my opinion, gives too much credence to certain ageist and sexist assumptions -- that it would be improper to question closely (and risk arousing the emotions of) a young female sexual assault victim, and that the jury cannot rise above its sympathy for young female sexual assault victims and do its assigned job -- that heavily informed D'Arcy's performance and decision-making. Along these lines, I note the majority's conclusion that Barbosa's age "render[s] her failure to report the rape immediately all the more explicable." Id. at 25. The explicability vel non of ___ ___ ___ Barbosa's failure to report the rape immediately -- as well -34- 34 as Barbosa's failure to testify truthfully about when she first reported the rape -- had vital bearing on Barbosa's credibility. It should have been left to the jury's consideration after argument by counsel. In my opinion, a reviewing court has no business explaining this failure away, without citation to supporting authority, as an understandable by-product of youth. While counsel must tread carefully in questioning the alleged victim in cases such as this, counsel cannot abdicate the constitutional responsibilities of a defense attorney. The record amply demonstrates that D'Arcy was more concerned with the young victim's emotional state than providing his client with a vigorous defense, and that his hands-off approach to the case led to a constitutionally- defective performance. The sentiments that prompted D'Arcy's ineffectiveness may be understandable. They cannot, however, be tolerated in our criminal justice system. III. III. ____ The majority opinion does not discuss D'Arcy's failure to object to the prosecutor's closing argument, and Magistrate Judge Bowler evaluates this failure only insofar as the argument mischaracterized the evidence. I think it important to note that the closing contained both an improper appeal to the jury to act other than as a dispassionate arbiter of the facts and an improper and inflammatory appeal -35- 35 to the jury's emotions. Neither type of argument is permissible. See, e.g., United States v. Manning, 23 F.3d ___ ____ _____________ _______ 570, 573 (1st Cir. 1994) (prosecutor may not ask jury to act other than as a dispassionate arbiter of the facts); Arrieta- ________ Agressot v. United States, 3 F.3d 525, 527 (1st Cir. 1993) ________ _____________ (prosecutor may not inflame the prejudices and passions of the jury). Here, the prosecutor told the jury: "Keep that picture of [Barbosa] in your mind. Those were not crocodile tears that came out of her eyes. Those were genuine tears based on honesty and certainty. Brenda Barbosa came to this court to seek justice, and you can give her justice. She is the victim." See ante at 17. Perhaps because the concept of ___ ____ "tears of certainty" is new to me, I regard the first three sentences of the quotation as an ill-concealed and inflammatory entreaty for jury sympathy. And the last two sentences of the quotation are at worst an appeal for vengeance and at best a request that the jury do something other than dispassionately judge the facts for itself. In a case as close as this one, these improper arguments could have made a real difference. D'Arcy's failure to object to them was another error in the long line of trial mistakes that show his incompetency beyond cavil. Appendix Follows Appendix Follows -36- 36