94 F.3d 640
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
Juan FERNANDEZ, Defendant-Appellant.
UNITED STATES, Appellant,
v.
Juan FERNANDEZ, Defendant-Appellee.
 Nos. 95-1864, 95-2067.
 United States Court of Appeals, First Circuit.
 Aug. 20, 1996.
 
 John Wall, with whom David Shaughnessy and Wall & Shaughnessy were on brief for appellant Juan Fernandez.
 Lena Watkins, Attorney, Criminal Division, Narcotic and Dangerous Drug Section, U.S. Department of Justice, with whom John C. Keeney, Acting Assistant Attorney General, Theresa M.B. Van Vliet, Chief, Criminal Division, Narcotic and Dangerous Drug Section, U.S. Department of Justice, and Guillermo Gil, Acting United States Attorney, were on brief for appellee United States.
 John Wall, with whom David Shaughnessy and Wall & Shaughnessy were on brief for appellant Juan Fernandez.
 Lena Watkins, Attorney, Criminal Division, Narcotic and Dangerous Drug Section, U.S. Department of Justice, with whom John C. Keeney, Acting Assistant Attorney General, Theresa M.B. Van Vliet, Chief, Criminal Division, Narcotic and Dangerous Drug Section, U.S. Department of Justice, and Guillermo Gil, Acting United States Attorney, were on brief for appellee United States.
 Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.
 TORRUELLA, Chief Judge.
 
 
 1
 A jury found appellant-defendant Juan Fernandez ("Fernandez") guilty of conspiracy to possess with intent to distribute cocaine, and the United States District Court, District of Puerto Rico, denied his motion for a new trial. Fernandez now raises a series of challenges to his conviction, and the government cross-appeals his sentence. For the reasons stated herein, we affirm.
 
 BACKGROUND
 
 2
 We begin with a basic outline of the case, and address the particulars in more detail as they arise, as the specific issues Fernandez raises require that we examine the facts from differing perspectives. Fernandez was one of 20 co-defendants charged in Count One of a September 1993 superseding indictment of conspiring to possess with intent to distribute more than 1,000 kilograms of cocaine and more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) & 846. Count One alleged 56 overt acts in furtherance of the conspiracy (the "Sardinas operation"), beginning in 1981 and continuing over twelve years.
 
 
 3
 The central allegation regarding Fernandez was that in or about the month of April 1991, he entered into an association with co-defendants Jorge Loredo-Alonso ("Loredo") and Horacio Sardinas-Albo ("Sardinas") to use Carrier Transportation Company ("Carrier"), a transportation company which Fernandez owned, to ship loads of cocaine from Puerto Rico to the continental United States. The indictment alleged that some nine loads of cocaine had been shipped through Carrier by early 1993.
 
 
 4
 Fernandez was tried with co-defendant Antonio Contreras. The evidence against Fernandez at the jury trial was primarily made up of the testimony of four alleged co-conspirators: Jose Bruno ("Bruno"), Elmo De Jesus ("De Jesus"), Michael Frame ("Frame"), and Lambert Aloisi ("Aloisi"). Bruno testified that nine loads of cocaine were shipped through Carrier, the first seven between April and August of 1991, and that he visited Carrier's warehouse in New Jersey several times in connection with those loads. Fernandez' counsel offered evidence indicating that Carrier did not in fact exist in April 1991, but rather was incorporated in August 1991, and began its occupation of the warehouse Bruno identified in October of that year. The prosecution in turn questioned defense witnesses about Gulf Transportation[1] ("Gulf"); according to the testimony, Gulf was a shipping company at which Fernandez had worked before he owned Carrier. In its closing argument, the government argued that Fernandez had used Gulf to transport cocaine prior to using Carrier. Fernandez was found guilty and was sentenced to 151 months.
 
 DISCUSSION
 A. Variance
 
 5
 Fernandez argues on appeal that there was a material variance between the superseding indictment and the evidence on which the government relied at trial.[2] We find a variance "when the proof differs from the allegations in the indictment." United States v. Vavlitis, 9 F.3d 206, 210 (1st Cir.1993). Not every variance mandates a new trial: reversal is only required if the variance proves both material and prejudicial. See Fed.R.Crim.P. 52(a); United States v. Arcadipane, 41 F.3d 1, 6 (1st Cir.1994). Thus, where, as here, "the government charges a defendant with a crime ... but the facts proven at trial vary somewhat from those charged in the indictment ... it is settled law that a conviction for the crime charged will be affirmed unless the variance as to the facts is shown to have prejudiced the defendant." United States v. Moran, 984 F.2d 1299, 1304 (1st Cir.1993). Our review of whether a retrial is required is plenary. Arcadipane, 41 F.3d at 6.
 
 
 6
 The superseding indictment specifically stated that Fernandez used Carrier to transport cocaine.[3] The government's case was consistent with this theory. Thus, Fernandez maintains, while Carrier was neither a defendant nor an object of the indictment, it was nonetheless a key part of the government's case. However, Fernandez continues, when he offered evidence in his defense which refuted the charges concerning Carrier by proving that it could not have been used as alleged in the superseding indictment, the government abruptly switched gears and argued that Fernandez used Gulf. The prejudice against him, Fernandez contends, was obvious: his trial preparations, which had centered around Carrier, were no longer adequate, since Gulf became the focus of the trial and the jury's deliberations.
 
 
 7
 We do not find such "obvious" prejudice; nor do we agree that Gulf became the focus of the trial and deliberations. We recognize that there was a variance, but do not believe it "work[ed] a substantial interference with the defendant's right to be informed of the charges laid at his doorstep." Arcadipane, 41 F.3d at 6. Simply put, although Carrier was repeatedly mentioned in the indictment, the charge was against Fernandez, not his company. Regardless of whether Carrier or Gulf is discussed, the charge is the same: that Fernandez associated with Sardinas and Loredo to transport cocaine. Fernandez cannot now claim that he was misinformed of the charges against him, or that his substantial rights were somehow affected. See id. at 7. A new trial is not required.
 
 B. Admission of the Evidence
 1. Gulf
 
 8
 Fernandez contends that the district court erred in allowing evidence and argument regarding Gulf. We review a lower court's admission of evidence for abuse of discretion. See, e.g., United States v. Disanto, 1996 WL 312368, * 11 (1st Cir.1996); United States v. Rivera-Gomez, 67 F.3d 993, 997 (1st Cir.1995).
 
 
 9
 Testimony regarding Gulf was elicited by the government, over Fernandez' objection, during its cross-examination of defense witness Rosa Sanjurjo, an employee in Carrier's collection department. She stated that she began working for Carrier in January of 1992, prior to which she worked for Gulf until 1990. She acknowledged that Fernandez had also worked for Gulf, that it did the same type of business as Carrier, and that it closed before Carrier was created. She also stated that Gulf did not become Carrier. On redirect, Fernandez' counsel elicited her testimony that Gulf was a corporation controlled by Fernandez and two other individuals, including Sanjurjo's stepson. She stated on recross that Carrier and Gulf had different offices and used different warehouses. George Wyle, a salesman for Carrier for part of 1992, testified on cross that he knew Fernandez through the shipping business prior to 1992, that Fernandez was involved with Gulf, that Gulf did essentially the same kind of business that Carrier did, and that Gulf's full name was Gulf Carrier.
 
 
 10
 After the first few questions to Sanjurjo about Gulf, defense counsel objected to the cross-examination on Gulf as being outside the scope of examination; the court allowed the prosecution to continue, but asking questions on direct, instead of on cross. After a few more questions, defense counsel asked for a sidebar, and objected that the questioning was outside the scope of the testimony and the entire case. The prosecutor argued that the evidence was being used for impeachment, pointing out that since Fernandez was arguing that it was impossible that Carrier could have been used, the evidence on Gulf would show that even before Carrier started Fernandez was in the same line of business, at a company which operated in essentially the same fashion, offering Fernandez access to shipping services, albeit under a different name. The court denied Fernandez' objection.
 
 
 11
 Before closing arguments, Fernandez' counsel raised the issue of whether the government should be allowed to make reference to Gulf in its closing argument. Defense counsel protested that the government was trying to make an inference not based on the evidence, since there was no evidence regarding whether Gulf and Carrier had a similar identity, or when Fernandez was involved with Gulf. Indeed, counsel noted, the testimony indicated no continuity of ownership between the companies, and that they used different facilities. The court, however, rejected the defense's argument and allowed the government to discuss Gulf in its closing argument.
 
 
 12
 Fernandez now argues that the district court erred in allowing evidence and argument regarding Gulf. He does not specify his reasons, however. Rather, he simply refers us to the reasons stated in his additional arguments, leaving us to speculate as to which reasons would apply in this context, and running the risk of waiver. As we address those contentions where they are made, we add only a few comments here.
 
 
 13
 Briefly stated, while it could have decided the issue several different ways, we find that the district court did not abuse its discretion in choosing to allow the government to elicit and use the evidence regarding Gulf. While not detailed, the evidence was certainly relevant, for the very reasons the government outlined. See Fed.R.Evid. 401; United States v. Griffin, 818 F.2d 97, 101-02 (1st Cir.), cert. denied, 484 U.S. 844 (1987) (noting the broad discretion district courts enjoy in determining relevance). Allowing the line of questioning and argument was neither unfairly prejudicial, see Fed.R.Evid. 403, nor constituted an unfair surprise: Fernandez' defense was that it was impossible for him to have used Carrier to ship cocaine because Carrier was not in operation--a line of reasoning fairly inviting the question of what other companies Fernandez had access to during the relevant time period, and whether he could have used them in a similar manner.
 
 2. Sixth Amendment Claims
 
 14
 Fernandez contends that his Sixth Amendment right of confrontation has been violated, in that he did not have a full and effective opportunity to cross-examine the witnesses. See Olden v. Kentucky, 488 U.S. 227, 231 (1988) (per curiam) (noting that the right of confrontation "includes the right to conduct reasonable cross-examination"). As we find no error on the part of the district court, we need not enter into a harmless error analysis. See id. at 232; Delaware v. Van Arsdall, 475 U.S. 673, 680-81 (1986).
 
 
 15
 First, Bruno and two other witnesses testified that a Puerto Rico senator was implicated in the conspiracy: they alleged that in 1990, when other members of the conspiracy were arrested in Tortola, the senator attempted to gain their release. Bruno testified that the senator received close to two hundred fifty thousand dollars in order to bribe the magistrate handling the case in the British Virgin Islands, as well as other individuals. Another witness testified that he believed the senator had met with representatives of the Sardinas operation in the Puerto Rico Senate--the witness claimed that he waited in the car outside while they met.
 
 
 16
 At trial, the court ruled in limine that counsel could not mention the senator's name. Fernandez argues that this constituted error requiring a new trial. First, he contends that identification of the senator's name could have "tipped the balance" in the impeachment of Bruno by showing that he would go to any lengths to obstruct justice, and thus should not be believed in his testimony at trial. Second, he posits that identification could have led the jury to believe that the account of the senator's involvement in the Tortola events was fabricated by witnesses in order to gain leniency from the government, because of the prominence and importance of the particular senator. Thus, the argument goes, the identification would have added to the evidence that the witnesses were fabricating stories in a desperate attempt to obtain leniency. Finally, Fernandez maintains that members of the jury could have felt that the failure to prosecute the senator was unfair selective prosecution.
 
 
 17
 We do not find any of these arguments convincing. There can be no question that the Sixth Amendment entails a right to cross examine a witness; nonetheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [regarding potential bias] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679; see Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam) ("Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."). The court informed the jury that it had ruled that the name of the senator "would not be mentioned in order to protect an ongoing investigation with respect to activities that he may have been engaged in." Tr. at 515. The jury was also informed that the parties stipulated that the senator was "prominent." Further, as noted above, the scope of the senator's alleged actions was explored through testimony from several witnesses: the sole element the court ordered be left out was the senator's name. Certainly the jury had enough information in front of it to be able to weigh the impeachment value of the alleged plot: it had "the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." Davis v. Alaska, 415 U.S. 308, 318 (1974). As for the selective prosecution claim, we note that the court told the jury there was an ongoing investigation: the implication that the senator had not been charged is clear. We do not find any error in the district court's ruling.
 
 
 18
 The second claim focuses on the De Jesus cross-examination. He testified that he assisted in the transportation of more than 1,000 kilograms of cocaine, yet his plea agreement stated that he was responsible for only 3.5 to 5 kilograms. The prosecution objected to defense's questioning on this discrepancy, and the court sustained the objection. The court ruled that the defense could not cross-examine De Jesus regarding the quantity of cocaine for which he was held accountable in his plea agreement, but could question him on the difference the agreement made in his sentence. De Jesus duly testified that without the plea he faced from thirty years to life, and that with it, he was facing seven years. He agreed that by testifying in this case, he was hoping to have the sentence further reduced so as to not have to spend any time in jail.
 
 
 19
 Fernandez argues that the court erred, since any proof of false, self-serving statements by a government witness--such as the plea agreement figure--would aid the defense in showing the witnesses' untrustworthiness. Thus, Fernandez contends, his Sixth Amendment right of confrontation was violated. See Olden, 488 U.S. at 231. We disagree. First, defense counsel was able to impeach De Jesus through eliciting his testimony on the impact the plea agreement had on his sentence and his hopes for a reduced sentence based on his participation in this trial. Second, the court's ruling seems to have been based on the concern that the jury understand that De Jesus was not actually lying in his plea agreement, but rather that the figure used was a mechanism of convenience in order to get to a specific sentence: "I think the whole concept is to show ... [that it was a] deal, a wow deal, but not to show that he's a liar because that's not the real facts." Tr. at 1879. We do not find that the district court erred in striking a balance between this concern and the importance of impeachment through limiting the testimony to the sentence obtained. Indeed, we agree with the court's comment to the effect that to do otherwise would run the risk of having defense counsel impeach the government, not De Jesus.
 
 
 20
 Fernandez' reliance on United States v. Lynn, 856 F.2d 430 (1st Cir.1988), is misplaced. There, we found that the trial court erred in restricting cross-examination into the circumstances underlying a witness' plea bargain. The witness' agreement with the government required that he take and "successfully complete" a polygraph examination. He took the test, twice, and the examiner labeled some of his answers as "inconclusive." The defense sought to impeach the witness by implying that the witness had not "successfully completed" the test, and so had motive to lie on the stand to please the government. The court cut off all questioning about the test, and informed the jury that such tests yielded inherently unreliable results. Id. at 432. We held that the district court abused its discretion by cutting off all cross-examination into a "relevant and not fully explored area." Id. at 434. The same is not true here. The district court did not cut off all examination in the area of De Jesus' credibility: rather, it set limits on the examination so as to permit the introduction of the information in a manner which would not mislead the jury yet provide it "with 'sufficient information concerning formative events to make a "discriminating appraisal" of [De Jesus'] motives and bias.' " Id. at 433 ( quoting United States v. Twomey, 806 F.2d 1136, 1140 (1st Cir.1986) ( quoting United States v. Campbell, 426 F.2d 547, 550 (2d Cir.1970))).
 
 
 21
 C. The Sufficiency and Weight of the Evidence
 
 1. Sufficiency of the Evidence
 
 22
 At the end of the presentation of evidence, Fernandez moved for a judgment of acquittal, which motion the trial court denied. Fernandez now argues anew that the evidence was insufficient to support his conspiracy conviction.
 
 
 23
 We are cognizant of the government's burden in this case: "In order to win a conspiracy conviction the government was required to establish, by direct or circumstantial evidence and beyond a reasonable doubt, that the defendant and one or more coconspirators 'intended to agree and ... to commit the substantive criminal offense which was the object of their unlawful agreement.' " United States v. Lopez, 944 F.2d 33, 39 (1st Cir.1991) (quoting United States v. Sanchez, 917 F.2d 607, 610 (1st Cir.1990), cert. denied, 499 U.S. 977 (1991)). In our review, we evaluate the sufficiency of the evidence as a whole, and "resolve credibility issues and draw inferences in the government's favor, since the issue is whether a jury could reasonably have arrived at the verdict." United States v. Morrow, 39 F.3d 1228, 1233 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1421 (1995).
 
 
 24
 Fernandez contends that the evidence in this case was insufficient to prove his guilt, since there was no direct testimony of any agreement. However, the government need not prove a formal agreement existed: as it points out, "the illegal agreement may be either 'express or tacit.' " United States v. Sanchez, 917 F.2d 607, 610 (1st Cir.1990). Indeed, " '[t]he evidence may be entirely circumstantial and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence.' " Lopez, 944 F.2d at 39 (quoting United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir.1991)).
 
 
 25
 We agree with the government that, under our standard of review, Bruno's testimony, and that of other government witnesses, suffices to show that a tacit agreement existed. Bruno testified that Sardinas and Loredo each paid $80,000 to buy into Carrier in order to ship cocaine; he stated that he saw them collect the money to make a payment to Fernandez, and heard them discussing the use of Carrier. Bruno testified about sending the nine shipments of cocaine, and about Fernandez' personal participation in the operation, including telephone calls and meetings. He stated that he went to the Carrier warehouse in New Jersey, his first visit being in July 1991, and that Fernandez was there on at least one occasion. Aloisi's testimony generally corroborated Bruno's statements. De Jesus testified that he participated in at least four shipments of cocaine, including deliveries of cocaine to Fernandez at a warehouse in Carolina, Puerto Rico, and retrieval from the New Jersey warehouse. His testimony contradicted Bruno's on several points, regarding the amount of cocaine in particular loads and who participated in specific meetings and loads.[4] Our review of this record leads us to conclude that, "having heard the evidence, including nuances and intimations that a cold record cannot capture, a rational jury could find beyond a reasonable doubt that [Fernandez] was guilty of conspiracy." Moran, 984 F.2d at 1301-02.
 
 
 26
 Fernandez also argues that this court must reverse the verdict below because it was physically impossible that Carrier was the company used to transport cocaine in 1991: he presented evidence that Carrier did not exist until after April 1991, and that it did not occupy the New Jersey warehouse until October of that year. Since the chief government witnesses testified that Carrier was used, the argument continues, there is no reason to credit the witnesses' testimony as to this point, or any other. Thus, Fernandez concludes that the trial court erred in not granting his motion for acquittal.
 
 
 27
 While there were inconsistencies in the witnesses' testimony, and while they all had an incentive to please the government, these aspects of the evidence were pointed out to the jury by defense counsel. As the government notes, Bruno and De Jesus did not go to any warehouse for the first loads--indeed, Bruno testified that Carrier had previously had a different address--and the evidence regarding Gulf suggests that Fernandez had knowledge of and access to shipping facilities during the relevant time frame. It was within the province of the jury to disregard some of the inconsistencies and to accept aspects of the witnesses' testimony as credible. "The force of the evidence as a whole, including all reasonable inferences favorable to the verdict, was sufficient to support a rational jury finding: that defendant was guilty." Lopez, 944 F.2d at 40.
 
 2. Weight of the Evidence
 
 28
 Fernandez also contends that the jury verdict was against the weight of the evidence, and that the district court erred in denying his motion for a new trial. Fernandez argues that the government's case here was wholly circumstantial and rested solely on the testimony of blatantly untrustworthy witnesses, as demonstrated by the many contradictions between their stories and Fernandez' evidence that Carrier had not occupied a warehouse until October 1991. The evidence regarding Gulf, he continues, is insufficient to support the eleventh-hour claim that Fernandez used it.
 
 
 29
 We review for abuse of discretion, see, e.g., United States v. Rogers, 41 F.3d 25, 34 (1st Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2287 (1995), and reject Fernandez' argument. The evidence against Fernandez, briefly outlined above, was neither unbelievable nor implausible, as he contends. Simply put, the witnesses' testimony was not "so inherently implausible that it could not be believed by a reasonable juror." United States v. Garcia, 978 F.2d 746, 748 (1st Cir.1992) (per curiam ). We accordingly find that the district court did not abuse its discretion in denying Fernandez' motion for a new trial, and refuse to take the issue of the witnesses' credibility out of the jury's hands. The jurors were entitled to weigh the witnesses' contradictions and incentives and still accept the substance of their testimony. See id.
 
 D. Prosecutorial Misconduct
 1. The Legal Framework
 
 30
 Fernandez' primary argument is that the prosecutor violated his due process rights by making improper statements to the jury during the government's closing argument and rebuttal. See Berger v. United States, 295 U.S. 78, 88-89 (1935). He contends that any one of the statements he now points to as improper could have prejudiced the jury so as to have prevented a fair trial, and that the cumulative effect of the statements was to deny him a fair trial under the Fifth Amendment. See United States v. Santana-Camacho, 833 F.2d 371, 373 (1st Cir.1987) (noting that, while a statement on its own may not have been harmful, it is "more troublesome" when viewed in conjunction with other prosecutorial statements). For the reasons we discuss below, we disagree.
 
 
 31
 When faced with a claim of prosecutorial misconduct, we first weigh whether a statement was improper. If it was, we then determine "whether prosecutorial misconduct has ' "so poisoned the well" ' that a new trial is required." United States v. Manning, 23 F.3d 570, 574 (1st Cir.1994) (quoting United States v. Hodge-Balwing, 952 F.2d 607, 610 (1st Cir.1991) (quoting United States v. Capone, 683 F.2d 582, 586-87 (1st Cir.1982))). This circuit has laid out a series of factors for guidance in making that determination:
 
 
 32
 (1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant.
 
 
 33
 Id.; see, e.g., United States v. Hardy, 37 F.3d 753, 757-58 (1st Cir.1994). In this analysis,
 
 
 34
 [w]e do not ... take the evidence in the light most favorable to the government or assume that credibility issues were resolved in its favor. The jury may well have decided the issues in favor of the government, but that jury decision may itself be tainted by the improper remarks. Thus we will look at the evidence as a whole....
 
 
 35
 Arrieta-Agressot v. United States, 3 F.3d 525, 528 (1st Cir.1993); see Hardy, 37 F.3d at 755.
 
 
 36
 We review the sole statement Fernandez objected to at trial de novo. Hardy, 37 F.3d at 756. He did not object to the majority of statements he now points to as violating his due process rights: we review those for plain error, as "[r]eviewing courts are very reluctant to reverse for unobjected-to errors that could have been corrected or ameliorated by timely objection." United States v. Procopio, Nos. 95-1549, -1559, -1550, slip op. at 25 (1st Cir. July 9, 1996); see Arrieta-Agressot, 3 F.3d at 528 (explaining rationale behind applying plain error review). "[T]he plain-error exception is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " United States v. Young, 470 U.S. 1, 15 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14 (1982), reh'g denied, 456 U.S. 1001 (1982)).
 
 
 37
 With our test and standard of review thus established, we turn to Fernandez' specific contentions.
 
 2. Statements Objected to at Trial
 
 38
 (1) During trial, a lease application filled out by Loredo in November, 1991, which stated that he had worked for Carrier for six years--well before the time the defense argued Carrier began to exist--was admitted for the limited purpose of showing that Loredo claimed he worked for Carrier, not for the truth of the matters in the document. Fernandez now contends that the prosecutor went beyond that limited purpose in his closing argument. Referring to the application, the prosecutor stated:
 
 
 39
 You remember, as you look at it here, there is a part ... where he's supposed to or he has to list his employer. His list what [sic]? Carrier Transportation. Just Carrier Transportation as his employer....
 
 
 40
 And most importantly, he said he was working for that company for six years. Six years. The phone numbers are right. The address is right. Working for the company, he says, for six years. This is proof that there was a Carrier Transportation that operated before the date that counsel--
 
 
 41
 Tr. at 2472. The prosecutor was cut off by the defense's objection.
 
 
 42
 We agree with Fernandez that the prosecutor was moving beyond the stipulation to assert that the lease application was "proof that there was a Carrier Transportation that operated before the date" the defense alleged it began business. Thus, we turn to our four-factor test. We note that the misconduct, though disingenuous, was not severe, and occurred only once, in relative isolation. More importantly, the court gave immediate curative instructions, admonishing the jury that the lease did not come in as anything more than a claim by Loredo to have worked for Carrier, and reminding them of its earlier instruction, made when the lease application was entered. Indeed, in its closing, the defense also reminded the jury of the limited use of the lease. On balance, we find that "the curative instruction sufficed to dispel any prejudice from the improper comment." United States v. Boldt, 929 F.2d 35, 41 (1st Cir.1991); see United States v. Savarese, 649 F.2d 83, 88 (1st Cir.1981).
 
 
 43
 (2) Fernandez objects to other references the prosecution made to Gulf on the basis that they encouraged speculation and attempted to argue facts not presented in the evidence.[5] First, the prosecutor stated:
 
 
 44
 we had to wait for cross-examination by [co-counsel for the government] to find out that there was a previous company before 1992, in fact from 1986 it had started, which did the exact same type of job. It had--it was a shipping company that did transportation in the same manner, through the containers and Mr. Juan Fernandez was also one of the owners or partners in the operation.
 
 
 45
 Tr. at 2475. Like Fernandez, we can find no evidence in the record stating that Gulf began in 1986. The offer of this fact is harmless, however, since the pertinent time period is 1991, and Sanjurjo testified that Gulf was in operation in 1990. The reference leaves open the crucial question, which is, when Gulf ceased operation. As for the form in which the prosecutor made his statement, it is consistent with the framework the government used for its argument, discussed in (1), above.
 
 
 46
 Fernandez objects to the cited passage and four others for asserting that Carrier and Gulf were essentially the same thing, doing the exact same job:
 
 
 47
 [O]ur argument is that before, when the company was operating as Gulf Carrier Transportation he used another warehouse in New Jersey.
 
 
 48
 ... [It] was known as Gulf Carrier, also. Gulf Carrier just like--the same name, just slightly different wording and same owners, same business, same thing.
 
 
 49
 Tr. at 2476. These statements, he contends, urged the jury to speculate in a manner unsupported and contradicted by the actual evidence regarding Gulf. There was evidence that they were both transportation companies, but not that they did the exact same job. Indeed, the owners were not the same: Fernandez was part owner of Gulf, and the sole owner of Carrier. Finally, there was no evidence that Gulf was actually in business in 1991.
 
 
 50
 On balance, we cannot find that this line of argument so poisoned the trial well that a new trial is required. See Manning, 23 F.3d at 574. The government made an argument based on the limited evidence regarding Gulf. The defense was able to argue the counter position, pointing out the lack of evidence, and did so.
 
 3. Statements Not Objected to at Trial
 
 51
 We examine the statements which Fernandez did not object to at trial in the order in which he raised them. We find that most are not improper; of the few that are, none of them prove so serious that the district court plainly erred in allowing them.
 
 
 52
 (1) Fernandez first argues that the prosecutor erred by trying to "secure the empathy of the jury" through asking it to step into the government's shoes and align itself with the prosecution team through statements like the following.
 
 
 53
 Now, the way I would like to discuss the evidence with you is in the order that we received it. Okay. The way we were interviewing these witnesses, in that order, to give you a feel for what we went through as you determine whether we have proven, as we submit to you we have, beyond a reasonable doubt the existence of the conspiracy and their participation....
 
 
 54
 Tr. at 2443. The prosecutor made a series of comments such as "[w]e seek [co-conspirators or drug traffickers] out and we go out and corroborate them." Tr. at 2442. We agree with the government, however, that, read in context, the statements Fernandez points to were simply establishing a framework for the presentation of the government's argument. They also served to point out that even though the government's witnesses were drug traffickers with a motive to fabricate evidence--as defense counsel had emphasized in opening argument--their testimony was corroborated. Indeed, in the first passage quoted above, the prosecution reminded the jury that it carried the duty of determining whether the government proved its case. While we do not necessarily recommend this framework for argument as an ideal one, we do not find that the statements were improper.
 
 
 55
 (2) Fernandez' second argument is that the prosecutor misstated the law on proof of conspiracy in making the following statements:
 
 
 56
 the only way we can prove a conspiracy is through the testimony of the very co-conspirators who were members of that conspiracy.
 
 
 57
 Tr. at 2441.
 
 
 58
 you're always going to need the testimony of the co-conspirator to prove a conspiracy because of the secrecy of the conspiracy.
 
 
 59
 Tr. at 2442.
 
 
 60
 You're never going to find a decent person testifying to a drug deal. That's what we got to deal with. That's what we got to do.
 
 
 61
 Tr. 2571-72. Contrary to appellant's assertion, these are arguments, not statements of fact, and are thus permissible.
 
 
 62
 Even if they were improper, they would not require a new trial. For, viewed in context, it is clear that they did not poison the trial proceeding. In his opening statement, Fernandez' counsel had emphasized the fact that no actual drugs were offered in evidence: the challenged comments were apparently designed to counter those statements with an explanation of why the government relied so heavily on witness testimony. The first two statements are addressed to the practical difficulties of proving a conspiracy. The prosecutor followed the first with an explanation of why the government did not introduce any actual drugs. Further, the prosecutor followed up these comments with a discussion of the importance of documentary evidence in corroborating witnesses' testimony, belying his own comments. As for the "decent person" comment, its logical flaws are obvious. Moreover, defense counsel had emphasized the witnesses' dishonesty in his opening,[6] to which this is apparently a response. These statements do not warrant a new trial.
 
 
 63
 (3) The prosecutor made two statements to the jury to the effect that "[t]o acquit, you would have to find that everybody was lying in this case." Tr. at 2590-91. Fernandez argues, and the government seems to agree, that these were improper. To the contrary, we feel they amounted to nothing more than argument, and were not improper.
 
 
 64
 (4) Fernandez' fourth contention is that the prosecutor made statements without evidentiary support. See Santana-Camacho, 833 F.2d at 373 (reversing conviction on basis of major and prejudicial misstatement of evidence in closing argument). The prosecutor erroneously stated that the testifying drug traffickers were "either in jail or go to [sic] jail," Tr. at 2442, and that Bruno specifically would be going to jail when, in fact, Aloisi had a non-prosecution agreement, and Bruno was not incarcerated at the time of trial. Again, the government acknowledges that the statements were not factually true. We agree with the government, however, that any error in admitting these statements does not rise to the level of plain error. The agreements between the government and the witnesses were in evidence, each of the four witnesses against Fernandez testified about his agreement with the government, defense counsel reminded the jury of their agreements in his closing argument, and the judge instructed the jurors that counsel's argument did not constitute evidence, but that their recollection of the facts controlled. Cf. United States v. Innamorati, 996 F.2d 456, 482 (1st Cir.) (finding no clear error where prosecution stated "that the trial judge alone would determine the sentences for each of the cooperating witnesses, and that the jury therefore should not think that the witnesses were getting 'a walk' " where, in fact, the government had dismissed charges against many of the witnesses and had promised to make motions for downward departures), cert. denied sub nom. DeMarco v. United States, 510 U.S. 955 (1993).
 
 
 65
 (5) Fernandez points out that the government made a second misstatement of the evidence by arguing that the payment which the two lead conspirators were alleged to have given Fernandez in order to buy into Carrier was "not an over the counter deal" but rather "a criminal association. It [was] a paper bag with eighty thousand dollars." Tr. at 2575. The government acknowledges that the paper bag details pertain to a different transaction, not involving Fernandez. The misstatement is troublesome in its characterization of the transaction, the details of which were not in evidence. However, between the brevity and isolation of the misstatement, the court's later instruction to the jury that their memory controlled, and defense counsel's failure to make a timely objection, Fernandez cannot clear the plain error hurdle.
 
 
 66
 (6) Next, Fernandez alleges that in his rebuttal argument the prosecutor provided information to contradict the testimony of a witness at trial. Without specifying what that information is, he cites the following passage discussing the testimony of Enrique Nieves ("Nieves"), Special Agent with the Drug Enforcement Administration.
 
 
 67
 Now, the other thing with Mr. Nieves. He said that there was a search warrant served on or about the time Mr. Fernandez was indicted. And that's false. You recall the testimony, that was the search warrant was at an unrelated warehouse of Mr. Velasco before we had any knowledge of the fact that they were using Carrier Transportation at the time of the first indictment. That's when that search warrant was served and that's when we were going after Mr. Velasco who was in the first indictment. So the fact that that search warrant was served and nothing was found, we were not after Mr. Juan Fernandez's business at the time because we didn't know about it.
 
 
 68
 Tr. at 2578.
 
 
 69
 Examination of the record sheds some light on the passage. First, the depiction of Nieves' testimony is correct: the warrant was for an unrelated warehouse, prior to any suspicion that the warehouse Carrier used was involved, and was served following the first indictment, which did not name Fernandez. Second, the "he" of "he said that there was a search warrant served" seems to refer not to Nieves, but to Fernandez' counsel. The latter had stated in his closing that Nieves testified that in September 1993--the time of the first indictment--he had testified at a bond hearing that a specific warehouse used by Carrier was not involved with the Sardinas operation. Defense counsel also referred to the search warrant for a different warehouse. It would seem that the prosecution blurred the line between the reference to the bond hearing and the search warrant and attributed the date given for the first to the second. While perhaps an error, it does not constitute the presentation of information to contradict the testimony of a witness at trial. Since Fernandez did not see fit to actually specify what element of the passage presented new information, and we see none ourselves, we find no plain error on the part of the district court in allowing the statement.
 
 
 70
 (7) The prosecutor's statement that "[t]hey could be doing additional loads besides the ones that Mr. Bruno was aware," Tr. at 2465-66, was not improper speculation, since it was made in the context of the prosecutor noting that De Jesus' testimony was that Bruno was not always involved in the transportation of loads of cocaine, and so the government was not always sure what number a load was: "they probably skipped the fifth and this is the sixth load, or it could be a totally different load. We don't know." Tr. at 2465. Even if the statement could be construed as improper speculation, Fernandez again fails to clear the hurdle of the four factors and prove that there was plain error on the part of the district court.
 
 
 71
 (8) Similarly, Fernandez contends that the prosecutor improperly generalized about his experiences in stating that
 
 
 72
 even on some minor details there is a lot of corroboration in this case, which is unusual. You will usually have little corroboration in that aspect, but even on details, as I go through the evidence I'll mention them, there is corroboration.
 
 
 73
 Tr. at 2444. See United States v. Rosa, 705 F.2d 1375, 1379 (1st Cir.1983) ("It is settled law in this circuit that a prosecutor may not inject into his jury argument his personal opinions about conclusions to be drawn from the evidence."). The prosecutor made this statement in the context of encouraging the jury to recognize that the presence of some inconsistencies in witness testimony does not preclude granting them credence. This statement falls somewhere on the spectrum between proper and improper argument. However, even assuming it was improper, we cannot find that it is so severe as to warrant a mistrial. In truth, the prosecutor was telling the jury what it probably already knows: that there will likely be differences in the stories told by two people recounting an event that occurred years earlier.
 
 
 74
 Fernandez makes the similar contention that the prosecution twice vouched for the credibility of prosecution witnesses by telling the jury that the witnesses were telling the truth because they did not get together to concoct a totally consistent story; the fact that their story was not totally consistent, the prosecution argued, reveals that "the only other alternative is that ... they were telling the truth and that the impeachment that they have been able to make to you is, I submit, as to details." Tr. at 2591. We agree with the government that these remarks amount to asking the jury to make common sense conclusions from the evidence.
 
 
 75
 The line between the legitimate argument that a witness's testimony is credible and improper "vouching" is often a hazy one, to be policed by the trial court in the first instance.... Here, at worst the challenged remarks ... fell in the grey area. [Defendant] did not object to the remarks at trial when a curative instruction might have been given, and we think that is the end of the matter.
 
 
 76
 Innamorati, 996 F.2d at 483 (dismissing challenge to prosecution statements that the testimony was well corroborated and "as a result, you know that the witness's testimony is true").
 
 
 77
 (9) There, is, however, no question that the prosecutor improperly injected himself into the argument in the next statement Fernandez challenges:
 
 
 78
 And who wrote the statement of facts? We wrote the statements of facts. So, the big mistake about Panama. You know who made it? I made it. Does that mean that they're not guilty? Does that mean that it wasn't from Venezuela that the SEA SEARCH came[?] No, it's a mistake I made. So, I should carry it.
 
 
 79
 Tr. at 2576. The prosecutor apparently made this statement in direct rebuttal to co-defendant's counsel, who highlighted--literally--a statement in De Jesus' plea agreement which indicated that the shipload of cocaine with which the co-defendant was allegedly involved came from Panama, while the indictment maintained it was Venezuela, without mentioning Panama. Given this context, the relative isolation of the statement, and the judge's instructions to the jury that their memory of the testimony controlled, this misconduct does not require a new trial, especially in light of our standard of review. See Young, 470 U.S. at 11-14 (discussing the "invited response" rule).
 
 
 80
 (10) We also dismiss Fernandez' contention that four statements made by the prosecution were generalizing about drug traffickers without evidentiary support. Each of these statements was to the effect of "that's the way drug dealers think." The statements were argument, and did not rise to plain error.
 
 
 81
 (11) Fernandez next challenges the prosecutor's reference to Fernandez' purported motive--greed and need for money--and argues that there was no evidence in the case on this point. Nonetheless, the statement is clearly proper: as the government notes, it is essentially a viable interpretation of the evidence. Indeed, the prosecutor followed the statements Fernandez now challenges by pointing to the testimony that, at least initially, Fernandez received two hundred dollars for each kilogram of cocaine transported--a clear financial incentive. Cf. United States v. Tajeddini, 996 F.2d 1278, 1285-86 (1st Cir.1993) (finding that, where the prosecutor did not deliberately misrepresent defendant's financial situation, where there was a financial incentive, and where defendant did not object at trial, prosecution statement that crime was motivated by payment was proper).
 
 
 82
 (12) Fernandez points to two references to the lease application discussed in section (2), above, as error. The first, when read in context, appears to be citing to other evidence to support the conclusion that Fernandez sought to conceal the earlier existence of Carrier:
 
 
 83
 I submit to [sic] as a fact that [Sanjurjo] should have known [whether Loredo started working after she started working] and the fact that she did not want to answer to you should be proof that Mr. Loredo was in fact working before that, as he claimed on his application.
 
 
 84
 Tr. at 2475. The prosecutor is offering Sanjurjo's testimony as proof, not the application.
 
 
 85
 The prosecution also referred to the application in its rebuttal.
 
 
 86
 [Defense Counsel] tells you that Jorge Loredo was looking for a part time job with Carrier Transportation Services. Well, look at the lease agreement. Look at the cars he list[s] as his property. In 1991 red Ferrari ... [and] a 1990 Range Rover. Black one. Is that a car of somebody who needs a second job to make ends meet [?] No, ladies and gentlemen of the jury, he wasn't looking for any part time job. He had a full time job and that was trafficking drugs, trafficking cocaine. With who? With his partner Juan Fernandez.
 
 
 87
 Tr. at 2575. On balance, we do not find that the lease application was submitted for the proposition that Carrier existed prior to when the defense asserted it began. Rather, the cited passage suggests that Loredo had no need for a part-time job, but that he already had one with Carrier. The evidence indicated that in November, 1991, the date of the lease agreement, Carrier had already been incorporated and had leased a warehouse in New Jersey. The reference to Carrier seems to have been to the November 1991 status, not Loredo's claim to have held a position there for 6 years.[7] Even if this reading is incorrect, however, and this was an improper reference, its admission was simply not plain error.
 
 
 88
 (13) Fernandez contends that on three occasions the government improperly alluded to the fact that he did not testify. "A prosecutor's comment is improper where, under the circumstances of the case, 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " Hardy, 37 F.3d at 757 (quoting United States v. Glantz, 810 F.2d 316, 322 (1st Cir.), cert. denied, 482 U.S. 929 (1987)). None of the statements Fernandez points to in this context meet this test.
 
 
 89
 First, in his rebuttal, the prosecutor referred to Gulf as the "other company that we didn't know they had, which at the beginning they didn't tell us about." Tr. at 2580. Read in context, it is clear that the jury would not "naturally and necessarily" take this as a comment on Fernandez' failure to testify, because the prosecutor is in fact referring to the premise that the evidence introduced about Carrier does not prove anything about Gulf. We note that the statement does not indicate that Fernandez did not tell the government about Gulf, rather, that "they "--the witnesses--did not tell it about Gulf. Second, the prosecutor argued that there was "no other explanation" for the fact that three witnesses had Fernandez' phone number "except that they were involved with him." Tr. at 2472. Third, the prosecution argued against the defense position that Fernandez' association with Loredo and Frame was an innocent one, positing that knowing three drug traffickers could hardly be a coincidence, and that "the only explanation" presented before the jury was a criminal association between the men.
 
 
 90
 We find that neither statement meets the "naturally and necessarily" criteria. Although Fernandez would presumably have been able to testify as to these things, so would the other witnesses. "Where arguably favorable evidence other than the defendant's own testimony is available to him, comment upon his failure to produce it may be justified." United States v. Sardelli, 813 F.2d 654, 657 (5th Cir.1987). Indeed, defense counsel argued in his closing that the dissemination of Fernandez' phone numbers and his associations with co-defendants were innocent. We find no plain error in the court's allowance of these statements. See Procopio, slip. op. at 23-25.
 
 
 91
 (14) Fernandez also contends that the government improperly tried to shift the burden of proof to the defense. The first cited statement asked: "Why would the defense be hiding the fact or they to portray [sic] the fact that Mr. Loredo started working for Carrier after 1992, if he started before[?]" Tr. at 2580. From the statement's context, it is apparent that this is a rebuttal to defense counsel's claim that Loredo's business card from Carrier dated from 1992: the prosecution counters that the business card had no date. The second statement cited pointed out that on direct examination Sanjurjo testified that Carrier started in 1992, adding:
 
 
 92
 But then we had to wait for cross examination by Mr. Pagel to find out that there was a previous company before 1992, in fact from 1986 it had started, which did the exact same type of job ... and Mr. Juan Fernandez was also one of the owners or partners in the corporation.
 
 
 93
 [Sanjurjo] denied at that point that the corporation was named Gulf Carrier or had Carrier in its name. We found that out through another witness at a later time.
 
 
 94
 Tr. at 2474-75. These comments are in keeping with the general structure of the prosecution's argument, discussed above, pointing out who testified what about Carrier and Gulf.
 
 
 95
 We find that these statements did not shift the burden of proof onto the defendant. On balance, any subtle implication that the burden of proof had shifted would have been mitigated by the court's instructions--as well as those of the prosecution and defense--regarding the burden of proof. While not necessarily ideal, the cited statements did not amount to reversible error under our standard of review.
 
 
 96
 (15) Fernandez points to four statements made in the government's rebuttal which are more troubling:
 
 
 97
 The second reason [why the prosecution has an opportunity for rebuttal] is, to help you see through this smoke screen that the defense always tries to raise to confuse you.
 
 
 98
 Tr. at 2574.
 
 
 99
 look how desperate [the defense is], look at the argument they're making to try to escape what is obvious to everybody.
 
 
 100
 Tr. at 2577.
 
 
 101
 The fact is, we do have enough evidence. The evidence beyond a reasonable doubt. They're just trying to confuse you. Don't allow them to be confusing.
 
 Tr. at 2585. Finally:
 
 102
 Their argument, really is that we cannot use these drug traffickers, the witnesses who were their friends and their associates, to convict. That's what they're saying. Well, ladies and gentlemen, that is an important weapon, an important tool in law enforcement, to deprive of us the ability to do that is [sic] to deal a hard blow to law enforcement....
 
 
 103
 ...
 
 
 104
 Now, these criminals, drug traffickers in general, think that they commit the crime and nobody catches them at that time, or the people who saw them were other drug traffickers that then they're home free. But unfortunately, for all these drug traffickers, including Mr. Contreras and Mr. Juan Fernandez, that's not the way it works. Because we in the law enforcement community, the people who you see sitting [at] this table, the agents that you saw testifying before you, they didn't give up. They kept on investigating and they didn't catch them when it happened, but they kept investigating and they kept catching other criminals and they were able to build a case around them. Because we have other means, other methods in which to investigate and to present cases to you.
 
 
 105
 And I submit to you that this is another way to present the case. And it also shows beyond a reasonable doubt that these defendants are guilty. So, they thought they had gotten away with their crimes when they committed them. The agents kept, they didn't give up, they kept investigating.
 
 
 106
 I ask you now don't give you up [sic] on us now. They thought they had gotten away with their crime. Don't you let them get away with their crime today.
 
 
 107
 Tr. at 2590-92.
 
 
 108
 We do not doubt that these statements constituted improper argument. See, e.g., Boldt, 929 F.2d at 40 (improper to comment on "favorite defense tactic"); Hardy, 37 F.3d at 757 (finding prosecution argument that defendants, who did not testify, were "still running and hiding" improper). Thus we turn to our four factors. First, regarding severity, while the misconduct is real, it is not as severe as some which we have previously found improper. See, e.g., Arrieta-Agressot, 3 F.3d at 527 (holding it improper to argue, inter alia, that "the defendants are not soldiers in the army of good. They are soldiers in the army of evil, in the army which only purpose [sic] is to poison, to disrupt, to corrupt"). In terms of the context, the government argues that these were isolated comments. However, the fact that the prosecutor made multiple, albeit brief, statements disparaging the role of the defense convinces us that they were not isolated comments. Indeed, the prosecutor ended his rebuttal shortly after finishing the last statement, enhancing its impression on the jury. As for any corrective instructions, Fernandez did not object to any of the statements. Finally, we note that the evidence against Fernandez was adequate, but not overwhelming.
 
 
 109
 In the end, although it is a close call, Fernandez does not prevail on this point. Because he made no objection at trial, Fernandez "must show that the improper remarks likely infected the jury (affected 'substantial rights' in Olano 's words) and mere possibilities are not enough." Procopio, slip op. at 26. Simply put, there was not much substance to the statements: while they were improper disparagement of the role of defense counsel, we do not see how they alone could have created " 'circumstances in which a miscarriage of justice would otherwise result.' " Young, 470 U.S. at 15 (quoting Frady, 456 U.S. at 163 n. 14); see Procopio, slip op. at 28-29 (stating that it was "unrealistic to suggest that ... empty cliches" that the defense arguments were "illusions" and "smoke screens" would have affected the jury's verdict).
 
 4. The Cumulative Effect
 
 110
 There are many reasons why defense counsel would choose not to make every possible objection during the government's closing argument. However, there is a cost to that strategy: most of the statements Fernandez now proffers as misconduct are reviewed under the deferential plain error standard. We have found, under that standard, that although various of the statements were indeed improper, they did not so poison the well that a new trial is mandated. Having reviewed the record and the closing arguments, we find the same is true as for their cumulative effect. Only the statements impugning the role of the defense give us real pause; nonetheless, even considering all the points where the prosecution's argument fell below the mark, we do not feel that a jury would have been improperly swayed by the argument. Nonetheless, we add that we are concerned by the sheer quantity of errors, however minor, in this case. The prosecution should weigh carefully its words when it next approaches the floor for argument. See id. at 29 (noting that "a pattern of faults does suggest a failure in supervision").
 
 E. Fernandez' Sentence
 
 111
 At sentencing, the court granted Fernandez a downward adjustment for being a minor participant in the conspiracy. See U.S.S.G. § 3B1.2(b). The government now argues on cross-appeal that the facts of the case do not support that adjustment. We review the district court's factual determinations for clear error, granting due deference to the trial court's application of the guideline to the facts. See United States v. Graciani, 61 F.3d 70, 75 (1st Cir.1995); United States v. Thompson, 32 F.3d 1, 4 (1st Cir.1994).
 
 
 112
 Section 3B1.2(b) offers a reduction to "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 (comment. n. 3). Of course, the mere fact that Fernandez may be less culpable than others involved in the conspiracy does not automatically entitle him to a reduction. See United States v. Daniel, 962 F.2d 100, 103 (1st Cir.1992). "Role-in-the-offense adjustments depend ... not only on the comparative conduct of persons jointly engaged in criminal activity, but also on comparing each offender's actions and relative culpability with the elements of the offense." United States v. Ocasio, 914 F.2d 330, 333 (1st Cir.1990).
 
 
 113
 The district court granted the adjustment on the basis that Fernandez' role was "limited in essence to looking the other way ... while his company was used to transport the narcotics," and that he "played a part in the overall conspiracy that makes him less culpable than that of the average participant." Sentencing Hearing at 29-30. The court made no more detailed findings.
 
 
 114
 The government contends that the evidence does not support the district court's findings. It points out that the evidence indicated that Fernandez joined the conspiracy, secured a large payment from Sardinas and Loredo at the outset, and received additional payment for the transportation of the cocaine, albeit a payment smaller than Sardinas'. According to the witnesses, he attended meetings, made his employees available to help, bribed a gatekeeper, and personally handled shipments. Additionally, Frame's testimony was that Fernandez acted as liaison to Sardinas with respect to marijuana and cocaine shipments. All this, topped with the district court's failure to make specific factual findings, the government contends, demonstrates that the court clearly erred in finding that Fernandez was entitled to the minor role adjustment. Finally, the argument concludes, the fact that the court made no specific findings as to witness credibility or Fernandez' role precludes reliance on cases upholding a district court's credibility determination at sentencing, see, e.g., United States v. Webster, 54 F.3d 1, 5 (1st Cir.1995), or Fernandez' argument that a plausible view of the evidence supports the district court's minor role determination.
 
 
 115
 The district court's failure to find more than the basic facts at sentencing lends a certain awkwardness to this case. Nonetheless, we disagree with the government's argument that the evidence presented at trial precludes granting the adjustment. Fernandez went to meetings, accepted money, and, if the witnesses' testimony is credible, knew what was going on. However, there was no evidence that he was in contact with the suppliers and receivers of the cocaine that the Sardinas organization transported, either in the New York area or in Memphis, or that he negotiated those deals or instructed the workers. Bruno testified that Fernandez attended a series of meetings, but did not testify that Fernandez ran those meetings, told Bruno what to do, or otherwise served as the organizer of the conspiracy. While we do not think that Fernandez' entitlement to the downward adjustment was a foregone conclusion, we cannot, on this record, find that it was plain error for the lower court to apply it. The district court found that Fernandez established that he was less culpable than most other participants in the conspiracy, and so was entitled to the adjustment. "In this instance, it would be foolhardy to second-guess the sentencing judge, given his superior coign of vantage." Ocasio, 914 F.2d at 333.
 
 CONCLUSION
 
 116
 For the reasons stated herein, we affirm.
 
 
 
 [1]
 The defendant refers to Gulf as "Gulf Transportation," while the government uses "Gulf Carrier Transportation." We express no opinion as to which name is more accurate, and use "Gulf" for convenience
 
 
 [2]
 Fernandez' motion for a bill of particulars, which included a request for discovery of other transportation companies utilized by Sardinas, was denied by the court
 
 
 [3]
 Paragraph 28 of the superseding indictment charged that "[o]n or about the month of April, 1991, HORACIO SARDINAS-ALBO, a/k/a/ HIPPIE, and JORGE ALONSO-LOREDO [sic] associated with JUAN FERNANDEZ to use the services of Carrier Transportation Company, a transportation company owned by JUAN FERNANDEZ, to transport large amounts of cocaine from Puerto Rico to the continental United States using containers." The following paragraphs detailed the nine alleged shipments of cocaine
 
 
 [4]
 Frame testified that Fernandez was already active in the operation in 1989 or 1990 and that he was instructed to communicate with Fernandez whenever he needed to contact Sardinas, which he did several times. These allegations were not in the superseding indictment
 
 
 [5]
 Fernandez objected to the prosecution's being allowed to use Gulf in its closing. However, his counsel did not object when the court held that the prosecution could "tell it to the jury." Tr. at 2438. The government points out that Fernandez did not make specific objections to these references to Gulf during closing argument, presumably asking us to review them under the more lenient plain error standard. As we find no error under either standard, we need not determine here whether the objection was preserved
 
 
 [6]
 For example, in his opening statement, Fernandez' counsel stated:
 And the evidence is that these drug pushers have consistently taken the easy way out of everything that is meaningful in life....
 ... [T]he evidence will show that they have no conscious [sic] that will prevent them--the kind of consciousness that would prevent most people from accusing an innocent man. They simply only care about themselves.... They always have and they always will. Leopards don't change their spots.
 Tr. at 105-06.
 
 
 [7]
 Indeed, the lease application may have been cited for a reason wholly unrelated to the Carrier employment claim: in it, Loredo reported that he owned a home in Puerto Rico, which would support the prosecution's contention that Loredo's material possessions--a house, two expensive cars--did not indicate that he needed a second job to make ends meet. The prosecution made no direct reference to that claim, however